**2017 IL 120331**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 120331)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. DREW PETERSON, Appellant.

*Opinion filed September 21, 2017.—Modified upon denial of rehearing January 19, 2018.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Thomas, Kilbride, Garman, and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial in the circuit court of Will County, defendant, Drew Peterson, was found guilty of the first degree murder of his third ex-wife, Kathleen Savio (Kathleen), and sentenced to 38 years' imprisonment. The appellate court affirmed defendant's conviction and sentence. 2015 IL App (3d) 130157. We

allowed defendant's petition for leave to appeal. For the reasons discussed below, we affirm.

¶ 2                                                BACKGROUND

¶ 3        The appellate court opinion contains a detailed recitation of the evidence adduced at trial (*id.* ¶¶ 2-172), and defendant does not challenge the sufficiency of such evidence. Accordingly, we provide only a summary of the events leading to defendant's arrest and prosecution and an overview of the State's evidence. Additional facts will be set forth in the analysis section as necessary for resolution of the issues raised in this appeal.

¶ 4        Defendant and Kathleen were married on May 3, 1992. During the marriage, the couple had two sons. The Peterson family lived in Bolingbrook, Illinois, where defendant was employed as a police officer. In early 2002, defendant and Kathleen each filed a petition for dissolution of marriage; the cases were consolidated. Kathleen was awarded temporary custody of the couple's sons and exclusive possession of the marital home. In a bifurcated dissolution proceeding, the marriage was dissolved on October 10, 2003, with child custody, child support, maintenance, and division of property to be determined at a hearing scheduled for April 6, 2004.

¶ 5        On Sunday evening, February 29, 2004, defendant attempted to return his sons to Kathleen after the boys' weekend visitation, but Kathleen could not be reached. The following evening defendant, with the assistance of a locksmith and along with four of Kathleen's neighbors, entered Kathleen's home. Kathleen's body was discovered in the bathtub. The Illinois State Police conducted the death investigation. An autopsy performed by Dr. Bryan Mitchell with the Will County Coroner's office determined that the cause of death was drowning. A coroner's inquest later determined that the manner of death was accidental.

¶ 6        Following Kathleen's death, a final judgment was entered in the couple's bifurcated divorce. Defendant was awarded sole custody of his two sons, and remaining financial issues were resolved in defendant's favor.

¶ 7        At the time of Kathleen's death, defendant was married to Stacy Cales. The couple, along with their infant son, lived in a home in Bolingbrook not far from

Kathleen's residence. During defendant's marriage to Stacy, the couple had another child, a girl.

¶ 8        On October 28, 2007, Stacy's sister, Cassandra Cales, reported to police that Stacy was missing. Defendant denied that Stacy was missing and told investigators that Stacy had left because they were having marital problems. Soon thereafter, Kathleen's body was exhumed. At the request of the Will County State's Attorney, a forensic pathologist, Dr. Larry Blum, performed an autopsy on November 13, 2007. Dr. Blum concluded that the manner of death was homicide. At the request of the Savio family, Dr. Michael Baden, a forensic pathologist, performed an autopsy on November 16, 2007. He, too, concluded that the manner of death was homicide.

¶ 9        In May 2009, a grand jury entered a two-count indictment against defendant for the first degree murder of Kathleen. See 720 ILCS 5/9-1(a)(1), (a)(2) (West 2004). During the seven-week jury trial that began in July 2012, the State presented evidence that numerous bruises and abrasions on Kathleen's body and a laceration to her scalp were consistent with a struggle and inconsistent with an accidental fall in the bathtub. The State also presented evidence that defendant had threatened Kathleen on several occasions, stating that he could kill her and make it look like an accident and that defendant had accessed Kathleen's home after he moved out and after Kathleen had changed the locks. Additionally, a witness for the prosecution testified that four months prior to her death, defendant had offered him $25,000 to help find a man to "take care of his third wife." Finally, the State presented evidence that, on the night of Kathleen's death, Stacy observed defendant, who had been absent from their home overnight, dressed in black and placing women's clothes that were not hers into the washing machine and that defendant coached Stacy on what to say to police when she was interviewed following the discovery of Kathleen's body.

¶ 10        The jury found defendant guilty, and the trial court subsequently sentenced defendant to 38 years' imprisonment. On direct review, the appellate court affirmed defendant's conviction and sentence. 2015 IL App (3d) 130157, ¶ 229. We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 11        Defendant urges this court to reverse the judgment of the appellate court and remand for a new trial, arguing that (1) certain hearsay statements were improperly admitted at trial under the forfeiture by wrongdoing doctrine, (2) counsel rendered

ineffective assistance when he called attorney Harry Smith as a witness at trial, (3) Smith's testimony should have been barred under the attorney-client privilege, (4) counsel was operating under a *per se* conflict of interest, (5) evidence of prior bad acts was improperly admitted at trial, and (6) cumulative error denied him a fair trial. We consider each argument in turn.

¶ 12                                    ANALYSIS

¶ 13                        I. Admission of Hearsay Statements
                        Under the Forfeiture by Wrongdoing Doctrine

¶ 14       Defendant first argues that certain hearsay statements were improperly admitted at trial under the forfeiture by wrongdoing doctrine and that such error requires this court to reverse his conviction and remand for a new trial. The State concedes that if the hearsay statements were admitted in error, such error was not harmless.

¶ 15       Resolution of defendant's argument requires this court to consider two principal issues: (1) whether, under separation of powers principles, the common-law doctrine of forfeiture by wrongdoing adopted by this court, rather than the forfeiture rule adopted by the legislature, governed the admission of the hearsay statements and (2) whether the State met its burden of proof at the pretrial forfeiture hearing for admission of the hearsay statements at trial. For a complete understanding of these issues, we first provide additional background and analysis as to how these issues arose and were treated by the courts below, as well as an overview of the relevant statute and the common-law doctrine of forfeiture by wrongdoing.

¶ 16       Prior to trial, the State filed a motion seeking the admission of hearsay statements made by Kathleen and Stacy. In its motion, the State identified several statements allegedly made by Kathleen to family members and others regarding threats defendant made to her in which he stated that he could kill her and make it look like an accident, she should just die, and she would not make it to the divorce settlement. The State further sought admission of a letter from Kathleen to the Will County State's Attorney's office, as well as Kathleen's handwritten statement

- 4 -

provided to police, recounting a July 5, 2002, incident in which defendant allegedly entered Kathleen's home without permission, pinned her to the stairs for over three hours while he reviewed their history, and threatened her with a knife. As to Stacy, the State generally sought admission of statements she made to others regarding defendant's conduct on the night of Kathleen's death.

¶ 17   Ordinarily, the rule against hearsay would prohibit the introduction at trial of such out-of-court statements that are offered to prove the truth of the matter asserted. *People v. Williams*, 238 Ill. 2d 125, 143 (2010); Ill. Rs. Evid. 801, 802 (eff. Jan. 1, 2011); see also *Novicki v. Department of Finance*, 373 Ill. 342, 344 (1940) (rule against hearsay provides that "a witness may testify only as to facts within his personal knowledge and not as to what somebody else told him"). The State, however, sought admission of these statements pursuant to section 115-10.6 of the Code of Criminal Procedure of 1963 (Code), a legislatively created exception to the hearsay rule. 725 ILCS 5/115-10.6 (West 2008). The General Assembly has since repealed section 115-10.6 (see Pub. Act 99-243, § 5 (eff. Aug. 3, 2015)), but at the time defendant was tried, the statute provided as follows:

"Hearsay exception for intentional murder of a witness.

(a) A statement is not rendered inadmissible by the hearsay rule if it is offered against a party that has killed the declarant in violation of clauses (a)(1) and (a)(2) of Section 9-1 of the Criminal Code of 1961 intending to procure the unavailability of the declarant as a witness in a criminal or civil proceeding.[1]

(b) While intent to procure the unavailability of the witness is a necessary element for the introduction of the statements, it need not be the sole motivation behind the murder which procured the unavailability of the declarant as a witness.

(c) The murder of the declarant may, but need not, be the subject of the trial at which the statement is being offered. If the murder of the declarant is not the subject of the trial at which the statement is being offered, the murder need not have ever been prosecuted.

---

[1]Subclauses (a)(1) and (a)(2) of section 9-1 of the Criminal Code of 1961 define the offense of first degree murder. 720 ILCS 5/9-1 (West 2008).

(d) The proponent of the statements shall give the adverse party reasonable written notice of its intention to offer the statements and the substance of the particulars of each statement of the declarant. For purposes of this Section, identifying the location of the statements in tendered discovery shall be sufficient to satisfy the substance of the particulars of the statement.

(e) The admissibility of the statements shall be determined by the court at a pretrial hearing. At the hearing, the proponent of the statement bears the burden of establishing 3 criteria by a preponderance of the evidence:

(1) first, that the adverse party murdered the declarant and that the murder was intended to cause the unavailability of the declarant as a witness;

(2) second, that the time, content, and circumstances of the statements provide sufficient safeguards of reliability;

(3) third, the interests of justice will best be served by admission of the statement into evidence.

(f) The court shall make specific findings as to each of these criteria on the record before ruling on the admissibility of said statements.

(g) This Section in no way precludes or changes the application of the existing common law doctrine of forfeiture by wrongdoing." 725 ILCS 5/115-10.6 (West 2008).

¶ 18 The State also sought admission of Kathleen's and Stacy's hearsay statements under the common-law doctrine of forfeiture by wrongdoing, referenced in subsection (g) of the statute (725 ILCS 5/115-10.6(g) (West 2008)). The common-law doctrine, which dates back to the seventeenth century, permits the introduction of an absent witness's statements where the defendant engaged in conduct designed to prevent the witness from testifying. *Giles v. California*, 554 U.S. 353, 359-61 (2008). The Supreme Court adopted the common-law doctrine in the early case of *Reynolds v. United States*, 98 U.S. 145 (1879). *Giles*, 554 U.S. at 366. *Reynolds* explained that the doctrine is founded on the equitable maxim that "no one shall be permitted to take advantage of his own wrong." *Reynolds*, 98 U.S.

at 159. The common-law doctrine was eventually codified in the Federal Rules of Evidence as an exception to the rule against hearsay. *Giles*, 554 U.S. at 367.[2]

¶ 19 In *People v. Stechly*, 225 Ill. 2d 246 (2007), this court recognized the common-law doctrine of forfeiture by wrongdoing as the law of Illinois. *People v. Hanson*, 238 Ill. 2d 74, 97 (2010). The common-law doctrine has since been codified in the Illinois Rules of Evidence. See Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011); *People v. Leach*, 2012 IL 111534, ¶ 66 n.1 (acknowledging that Illinois Rules of Evidence codified the preexisting common-law rules of evidence); *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 49 ("Illinois Rules of Evidence codified the existing rules of evidence in this state, including the common-law doctrine of forfeiture by wrongdoing"). Similar to its federal counterpart, the Illinois rule provides that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is "not excluded by the hearsay rule." Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011).

¶ 20 Before ruling on the State's motion to admit Kathleen's and Stacy's hearsay statements under section 115-10.6 of the Code or the common-law doctrine of forfeiture by wrongdoing, the court held a pretrial hearing, as required by the statute. At the hearing, which commenced in January 2010, the trial court heard testimony from 72 witnesses and received into evidence over 200 exhibits and numerous stipulations. The trial court ultimately ruled that the State had proven, by a preponderance of the evidence, that defendant murdered Kathleen and Stacy and that such murders were intended to cause the women's unavailability as witnesses. The trial court further found that the time, content, and circumstances of six of the statements provided sufficient safeguards of reliability and that the interests of justice would best be served by their admission into evidence. The trial court found the remaining statements not sufficiently reliable. The trial court later clarified that its ruling was made solely under section 115-10.6 of the Code and denied the State's motion seeking admission of the excluded statements pursuant to the common-law doctrine.

---

[2] The federal rule provides that "[a] statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result," is "not excluded by the rule against hearsay." Fed. R. Evid. 804(b)(6).

¶ 21     The State appealed the trial court's ruling. See Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2006). In a divided opinion, the appellate court held that it lacked jurisdiction. *People v. Peterson*, 2011 IL App (3d) 100513, *vacated in part by People v. Peterson*, No. 112875 (Nov. 30, 2011) (supervisory order). We subsequently denied the State's petition for leave to appeal but entered a supervisory order directing the appellate court to vacate its judgment and address the State's appeal on the merits. *Peterson*, No. 112875 (Nov. 30, 2011) (supervisory order).

¶ 22     In its subsequent opinion, the appellate court held that section 115-10.6 of the Code stood in direct conflict with the common-law doctrine of forfeiture by wrongdoing, as adopted by this court and as codified in Illinois Rule of Evidence 804(b)(5). *People v. Peterson*, 2012 IL App (3d) 100514-B, ¶ 22. The appellate court explained that, unlike the common-law doctrine, the statute requires a finding of reliability and, under separation of powers principles, the conflict must be resolved in favor of the rule or decisions of this court. *Id.* ¶¶ 22-24.

¶ 23     The appellate court observed that although the trial court applied the wrong rule of law, the trial court had made the necessary factual findings for admission of the statements under Illinois Rule of Evidence 804(b)(5), namely, that the State had proved by a preponderance of the evidence that (1) defendant murdered Kathleen and Stacy and (2) defendant did so with the intent to make the two women unavailable as witnesses. *Id.* ¶ 25. Based on the trial court's findings, the appellate court concluded that the excluded statements were admissible at trial under the rule, subject to any other evidentiary objections, and reversed and remanded the matter to the trial court for further proceedings. *Id.* ¶ 25 n.6, ¶ 32.

¶ 24     On remand, the case eventually proceeded to a jury trial, at which several hearsay statements made by Kathleen and Stacy were admitted into evidence.[3] The jury found defendant guilty of first degree murder in the death of Kathleen. On direct review following defendant's conviction, defendant again challenged the admissibility of Kathleen's and Stacy's hearsay statements. The appellate court, however, declined to consider the matter, concluding that its earlier ruling was the "law of the case." 2015 IL App (3d) 130157, ¶ 204.

---

[3]The judge who presided over defendant's jury trial was not the same judge who presided over the pretrial forfeiture hearing.

¶ 25    The law of the case doctrine bars relitigation of an issue previously decided in the same case. *People v. Sutton*, 233 Ill. 2d 89, 100 (2009). Thus, an issue of law decided by the appellate court in a first appeal is generally binding upon that court in a second appeal. *Id.* That limitation, however, does not apply to this court. *People v. Hopkins*, 235 Ill. 2d 453, 470 (2009). " 'Our review may cover all matters properly raised and passed on in the course of [the] litigation.' " *Id.* (quoting *Relph v. Board of Education of DePue Unit School District No. 103*, 84 Ill. 2d 436, 442 (1981)). As explained in *Hopkins*, "[i]n finding the law of the case doctrine inapplicable in this court, the emphasis has been on the fact that it was 'the first time the case has been before this court,' and not on when the issue was addressed in the appellate court." *Hopkins*, 235 Ill. 2d at 470 (quoting *Sutton*, 233 Ill. 2d at 100). Accordingly, on appeal from the appellate court's second decision in a case, this court may consider an issue raised and passed upon by the appellate court in its first decision. See *id.*; *Krautsack v. Anderson*, 223 Ill. 2d 541, 552 (2006).

¶ 26    In this case, although the appellate court was bound by the law of the case announced in its first decision, this court is not. We will therefore consider whether the appellate court erred in its first decision when it held that, under separation of powers principles, the common-law doctrine of forfeiture by wrongdoing, adopted by this court and embodied in Illinois Rule of Evidence 804(b)(5), governed the admissibility of Kathleen's and Stacy's hearsay statements, rather than section 115-10.6 of the Code.

¶ 27                                  *Separation of Powers*

¶ 28    Defendant contends that section 115-10.6 of the Code can be reconciled with this court's rule and, thus, the statute does not offend separation of powers and should have been given effect in this case. According to defendant, section 115-10.6 applies only when the defendant murdered the absent witness and Illinois Rule of Evidence 804(b)(5) applies when the defendant rendered the witness unavailable through any means other than murder. The State counters that Illinois Rule of Evidence 804(b)(5) applies to *all* cases where a defendant's wrongdoing renders a witness unavailable to testify. The State posits that the statute directly and irreconcilably conflicts with this court's rule and the appellate court properly held that the rule governs. Because the parties' arguments present a purely legal issue,

our review proceeds *de novo*. See *People v. Clemons*, 2012 IL 107821, ¶ 8; *In re Adoption of K.L.P.*, 198 Ill. 2d 448, 453 (2002).

¶ 29 The separation of powers clause of the Illinois Constitution provides that the "legislative, executive and judicial branches are separate" and that "[n]o branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. Thus, each branch of government has its own unique sphere of authority. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 410 (1997). The judicial article of the Illinois Constitution vests this court with general administrative and supervisory authority over all courts. Ill. Const. 1970, art. VI, § 16. This grant of authority "clearly empowers this court to promulgate procedural rules to facilitate the judiciary in the discharge of its constitutional duties." *O'Connell v. St. Francis Hospital*, 112 Ill. 2d 273, 281 (1986). Thus, the judicial power includes rulemaking authority to regulate the trial of cases. *Kunkel v. Walton*, 179 Ill. 2d 519, 528 (1997); *People v. Cox*, 82 Ill. 2d 268, 274 (1980). Such authority necessarily extends to the adoption of rules governing the admission of evidence at trial, an authority this court has frequently exercised. See, *e.g.*, *People v. Lerma*, 2016 IL 118496, ¶ 24 (recognizing that the research concerning eyewitness identification "is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony" at trial); *People v. Gard*, 158 Ill. 2d 191, 201, 204 (1994) (acknowledging that "[t]his court has consistently held evidence pertaining to polygraph examination of a defendant generally inadmissible" and holding that evidence of polygraph examination of a witness is also inadmissible); *Wilson v. Clark*, 84 Ill. 2d 186, 196 (1981) (adopting Federal Rules of Evidence 703 and 705 concerning expert opinions offered at trial); *People v. Montgomery*, 47 Ill. 2d 510, 516-19 (1971) (adopting then-proposed Federal Rule of Evidence 609, limiting the use of prior convictions to impeach the credibility of a witness).

¶ 30 The separation of powers clause, however, is not intended to achieve a " 'complete divorce' " between the branches of government. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 33 (2001) (quoting *In re J.J.*, 142 Ill. 2d 1, 7 (1991)); *Kunkel*, 179 Ill. 2d at 528. The separate spheres of authority exercised by each branch may "overlap." *Kunkel*, 179 Ill. 2d at 528; *Best*, 179 Ill. 2d at 411. The law of evidence is one area in which an overlap between the spheres of authority exercised by the judicial and legislative branches exists. Although this court is empowered to promulgate rules regarding the admission of evidence at trial, the

General Assembly may legislate in this area without necessarily offending separation of powers. *First National Bank of Chicago v. King*, 165 Ill. 2d 533, 542 (1995) (citing *People v. Rolfingsmeyer*, 101 Ill. 2d 137, 140 (1984)); accord Ill. Rs. Evid., Committee Commentary (eff. Jan. 1, 2011) ("Illinois Rules of Evidence are not intended to preclude the Illinois legislature from acting in the future with respect to the law of evidence"). Because the legislature is the branch of government charged with the determination of public policy, it has "the concurrent constitutional authority to enact complementary statutes." *People v. Walker*, 119 Ill. 2d 465, 475 (1988).

¶ 31 Notwithstanding this overlap between the judicial and legislative branches, this court retains primary constitutional authority over court procedure. *Kunkel*, 179 Ill. 2d at 528. Accordingly, where an irreconcilable conflict exists between a legislative enactment and a rule of this court on a matter within the court's authority, the rule will prevail. *Id.* (citing *Walker*, 119 Ill. 2d at 475-76); see also Ill. R. Evid. 101 (eff. Jan. 1, 2011) ("statutory rule of evidence is effective unless in conflict with a rule or a decision of the Illinois Supreme Court"). We agree with the State that, in this instance, the statute and the rule cannot be reconciled and the statute must give way to the rule.

¶ 32 Rule 804(b)(5) identifies only two criteria or factors that must be satisfied for the admission of hearsay statements under the rule: (1) that the party against whom the statement is offered "has engaged or acquiesced in wrongdoing" and (2) that such wrongdoing "was intended to, and did, procure the unavailability of the declarant as a witness." Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). The rule, like our case law, makes no distinction based on the nature of the "wrongdoing." Thus, contrary to defendant's argument, the rule applies whether the declarant is rendered unavailable through murder or some other wrongdoing. See *Hanson*, 238 Ill. 2d at 93-99 (applying forfeiture by wrongdoing doctrine where the declarant was murdered by the defendant); *Stechly*, 225 Ill. 2d at 277-78 (remanding for hearing to determine whether, under the forfeiture by wrongdoing doctrine, the defendant's threats were intended to and did cause the child declarant to be legally unavailable to testify).

¶ 33 In contrast to the rule, section 115-10.6 of the Code applies exclusively to cases involving the declarant's murder. Significantly, the statute imposes additional

criteria that must be satisfied for admission of the declarant's statements at trial: the proponent of the statements must demonstrate, and the trial court must make a specific finding on the record, that "the time, content, and circumstances of the statements provide sufficient safeguards of reliability." 725 ILCS 5/115-10.6(e)(2) (West 2008). This court has held, however, that a defendant forfeits his ability to challenge the reliability of the declarant's statements by the very act of preventing the declarant from testifying. *Hanson*, 238 Ill. 2d at 98. Indeed, requiring additional indicia of reliability would undermine the equitable considerations at the very center of the forfeiture by wrongdoing doctrine. *Id.* Accordingly, "so long as the declarant's statements are relevant and otherwise admissible, statements admitted under the forfeiture by wrongdoing doctrine need not reflect additional indicia of reliability." *Id.* at 99.

¶ 34 The statute's imposition of a reliability requirement creates an irreconcilable conflict with a rule of this court on a matter within the court's authority. Under such circumstances, separation of powers principles dictate that the rule will prevail. *Kunkel*, 179 Ill. 2d at 529. Thus, the appellate court did not err when it held, in its earlier decision, that the admissibility of Kathleen's and Stacy's hearsay statements was governed by the common-law doctrine of forfeiture by wrongdoing, embodied in Illinois Rule of Evidence 804(b)(5), and not section 115-10.6 of the Code.

¶ 35 *Sufficiency of the Evidence at the Pretrial Forfeiture Hearing*

¶ 36 We next consider whether, as defendant argues, the trial court erred when it found that the State met its burden of proof at the pretrial hearing for admission of Kathleen's and Stacy's hearsay statements at trial. Defendant made this argument on direct review in the appellate court. 2015 IL App (3d) 130157, ¶ 201. The appellate court declined to consider this issue, again relying on the law of the case doctrine. *Id.* ¶ 204. The law of the case doctrine, however, only bars relitigation of an issue previously decided in the same case. *Sutton*, 233 Ill. 2d at 100. In its earlier decision, the appellate court only addressed the separation of powers issue; it did not address whether the State satisfied its burden of proof for admission of the women's statements. Thus, the appellate court erred in declining to address this issue based on the law of the case doctrine. Although this court could remand the case to the appellate court, because the complete record is before us and the issue

has been fully briefed, in the interest of judicial economy we elect to address the issue. See *People v. Shinaul*, 2017 IL 120162, ¶ 13; *People v. Olivera*, 164 Ill. 2d 382, 394 (1995).

¶ 37     The State's burden of proof at a forfeiture by wrongdoing hearing is a preponderance of the evidence. *Stechly*, 225 Ill. 2d at 278 (citing *Davis v. Washington*, 547 U.S. 813, 833 (2006)). The preponderance standard is a less stringent standard than proof beyond a reasonable doubt or even the intermediate standard of clear and convincing evidence. *In re D.T.*, 212 Ill. 2d 347, 362 (2004). Under the preponderance standard, the State need only present evidence " 'that renders a fact more likely than not.' " *People v. Brown*, 229 Ill. 2d 374, 385 (2008) (quoting *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007)). Thus, in a forfeiture hearing, the State must establish that defendant, more likely than not, "engaged or acquiesced in wrongdoing" and that such wrongdoing was "intended to, and did, procure the unavailability of the declarant as a witness." Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011).

¶ 38     Defendant here does not challenge the trial court's finding that the State established the "wrongdoing factor," *i.e.*, that the State proved by a preponderance that he murdered Kathleen and Stacy. Defendant does challenge the trial court's finding that the State established the "intent factor," *i.e.*, that the State proved by a preponderance that he murdered the two women to make them unavailable as witnesses.

¶ 39     The parties agree that the trial court's ruling should be reviewed under an abuse of discretion standard. This standard generally applies to a trial judge's decision to allow or exclude evidence. *D.T.*, 212 Ill. 2d at 356. Because an evidentiary ruling typically requires the trial court to exercise discretion, *i.e.*, to "make a judgment call," reviewing such rulings only for an abuse of discretion is appropriate. *People v. Chambers*, 2016 IL 117911, ¶ 75. The admission of hearsay statements into evidence pursuant to the forfeiture doctrine, however, is not dependent on a judgment call by the trial court. Admission is dependent on whether the trial court finds, by a preponderance of the evidence, that the defendant engaged in wrongdoing that was intended to, and did, procure the witness's unavailability. "[W]hen a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence."

*Best v. Best*, 223 Ill. 2d 342, 348-49 (2006). A finding is against the manifest weight of the evidence where "the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). In *Hanson*, we implicitly applied the manifest weight standard in the context of a forfeiture by wrongdoing hearing where we concluded that the circuit court's finding that the defendant caused the declarant to be unavailable was not "arbitrary or unreasonable." *Hanson*, 238 Ill. 2d at 99. Thus, we will review the trial court's ruling here under the manifest weight of the evidence standard, and not for an abuse of discretion.

¶ 40    Before reviewing the evidence of intent introduced at the pretrial hearing, we consider defendant's argument concerning the kind of evidence necessary for a finding of intent. Defendant argues that because the forfeiture by wrongdoing doctrine only applies where the defendant designed to prevent the witness from testifying (see *Giles*, 554 U.S. at 359-68), the State was required to identify the specific testimony from Kathleen and Stacy that he wished to avoid when he allegedly murdered them. Defendant contends that because the State failed to do so, the State did not meet its burden of proof as to the intent factor. In support, defendant cites *State v. Dillon*, 2016-Ohio-1561, 63 N.E.3d 712 (Ohio Ct. App.), *People v. Roscoe*, 846 N.W.2d 402 (Mich. Ct. App. 2014) (*per curiam*), and *Jensen v. Schwochert*, No. 11-C-0803, 2013 WL 6708767 (E.D. Wis. 2013).

¶ 41    We agree with defendant's first proposition. The common-law doctrine of forfeiture by wrongdoing generally applies only where the defendant designed to prevent the witness from testifying. See *Giles*, 554 U.S. at 359-68; see also *In re Rolandis G.*, 232 Ill. 2d 13, 40 (2008) (stating that under *Giles*, "for forfeiture by wrongdoing to apply, the evidence had to show that the defendant engaged in witness tampering or some type of conduct designed to prevent the witness from testifying, thwart the judicial process, or procure the witness' absence from trial").

¶ 42    We disagree, however, with defendant's second proposition—that proof of a defendant's intent to prevent a witness from testifying requires the State to identify the specific testimony from the absent witness that the defendant wished to avoid. Nothing in *Giles*, our case law, or the language of Illinois Rule of Evidence 804(b)(5), suggests such an evidentiary requirement. And the out-of-state cases on which defendant relies do not lend support to his argument. In each case, the

reviewing court found error in the admission of hearsay statements from the murder victim based on lack of evidence of intent (*Dillon*, 2016-Ohio-1561, 63 N.E.3d 712, at ¶ 25; *Jensen*, 2013 WL 6708767, at *8) or the failure of the trial court to make any finding of intent (*Roscoe*, 846 N.W.2d at 408). But in no case did the reviewing court suggest, much less hold, that forfeiture by wrongdoing does not apply unless the State identifies the specific testimony the defendant sought to avoid.

¶ 43 We recognize, of course, the evidentiary value to the State of identifying the testimony the absent witness likely would have provided. Establishing the intent factor is an easier task with, rather than without, such evidence. But adopting defendant's position and requiring such evidence in every case in which the State relies on the forfeiture by wrongdoing doctrine would come very close to imposing upon the State the burden of proving intent by direct evidence. Motive and intent, however, are rarely proved by direct evidence. Rather, they "must be inferred from conduct and the surrounding circumstances." (Internal quotation marks omitted.) *In re Edmonds*, 2014 IL 117696, ¶ 54; see also *People v. Maggette*, 195 Ill. 2d 336, 354 (2001) (intent "not only can be inferred from the surrounding circumstances [citation] but usually is so proved"). No reason exists to depart from this evidentiary construct. Accordingly, we hold that the State need not identify the specific testimony defendant wished to avoid in order to prove defendant's intent for purposes of the forfeiture by wrongdoing doctrine.

¶ 44 We turn now to the evidence of intent introduced at the pretrial hearing to determine whether the State met its burden of proving, by a preponderance, that defendant murdered Kathleen and Stacy to prevent them from testifying. We note that at a forfeiture hearing, the trial court may consider hearsay evidence, including the unavailable witness's hearsay statements. *Stechly*, 225 Ill. 2d at 278 (citing *Davis*, 547 U.S. at 833); see also Ill. R. Evid. 104(a) (eff. Jan. 1, 2011) (when deciding preliminary questions concerning the admissibility of evidence, "the court is not bound by the rules of evidence except those with respect to privileges").

¶ 45 Focusing first on defendant's intent as to Kathleen, the State's theory is that defendant murdered Kathleen to prevent her from testifying at the April 6, 2004, hearing in the bifurcated divorce proceeding, at which issues of child custody, child support, maintenance, and division of property would be decided. The State

presented extensive evidence regarding the acrimonious nature of the couple's divorce. For example, testimony established that defendant was adamant that Kathleen not receive any portion of his pension from his years of service in the Bolingbrook police department. Defendant was angry that their attorneys were "getting all [his] money," and he publicly stated that he would be better off if Kathleen was dead. The couple was fighting over money, as Kathleen tearfully advised her employer following a conversation with defendant in the parking lot of the office where she worked. Additionally, custody of the couple's two sons remained a contested issue. Kathleen was passionate about not relinquishing custody to defendant. Indeed, just six weeks prior to her death, when Kathleen became convinced that she might not make it to the hearing, she extracted a promise from her sister, Anna Doman, that Anna would take care of Kathleen's sons should anything happen to her.

¶ 46    In short, settlement of the remaining issues in the bifurcated divorce was not a realistic possibility. Thus, no question exists that Kathleen would have testified at the April 2004 hearing, as she had at an earlier hearing. Although the trial court could not know for certain how that hearing would have proceeded or what Kathleen's testimony ultimately would have been, the trial court certainly knew that Kathleen, as a party opponent, was defendant's primary adversary. Accordingly, the inference that defendant murdered Kathleen to prevent her from testifying is much stronger in this case, where a party to the litigation is murdered, than in a case where the person murdered had only a tangential relationship to the litigation or would have been, at most, a minor witness.

¶ 47    In addition to the acrimonious nature of the divorce proceedings and the certainty that Kathleen would have testified at the April 2004 hearing, the State offered other evidence relevant to defendant's intent. Jeffrey Pachter testified for the State that he and defendant became friends when they both worked at a cable company. According to Pachter, in the winter of 2003, defendant asked Pachter if he wanted to go on a "ride along" in his police vehicle. Pachter accepted. During the ride, defendant asked Pachter if he knew anyone that could have his "third wife taken care of." Defendant explained that "she has something on me." Defendant mentioned a $25,000 payment to Pachter but indicated that if Pachter found someone to do it for less, he could keep the difference. Defendant did not identify

the "something" that Kathleen had on him, but the import of Pachter's testimony is that defendant wished to silence Kathleen.

¶ 48       The State presented evidence that because Kathleen was silenced, the financial and custody issues pending at the time of her death in the divorce proceeding were ultimately resolved in defendant's favor: defendant was awarded custody of his two sons, defendant was awarded the proceeds from the sale of the marital home, and defendant was awarded the business known as Blue Lightning Corporation. Additionally, Harry Smith, Kathleen's divorce attorney, testified that had Kathleen not died, educational, medical, and other expenses for Kathleen's and defendant's two sons would have been shared by the parties. Because Kathleen died, a trust fund for the two boys was set up with the proceeds from an insurance policy on Kathleen's life. The proceeds, which exceeded $1 million, were paid to defendant as the guardian of his sons' estates.

¶ 49       Defendant disputes the sufficiency of the foregoing evidence, arguing that no matter how horrific the murder of a spouse may be, the forfeiture by wrongdoing doctrine does not apply unless the defendant killed his spouse to prevent testimony. Defendant contends that the State's evidence established, at most, that Kathleen's unavailability benefited him financially and allowed him to obtain sole custody of his sons. According to defendant, the State has confused a motive for murder with the specific intent to avoid testimony. We disagree.

¶ 50       The State was not required to demonstrate that preventing Kathleen from testifying was defendant's sole intent when he murdered her. The State was only required to prove that her murder was motivated "at least in part" by an intent to prevent her from testifying. *Stechly*, 225 Ill. 2d at 272; see also *People v. Burns*, 832 N.W.2d 738, 746 (Mich. 2013) (prosecution must show that defendant acted, "at least in part," with the purpose to cause the declarant's unavailability); *United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir. 1996) (sufficient to show that the defendant "was motivated *in part* by a desire to silence the witness," and the "intent to deprive the prosecution of testimony need not be the actor's *sole* motivation" (emphases in original)).

¶ 51       Based on our careful review of the evidence at the pretrial hearing, and mindful that the State's burden was a preponderance of the evidence, we cannot say that the trial court's finding that the State proved that defendant murdered Kathleen to

prevent her from testifying was "unreasonable, arbitrary, or not based on the evidence presented." *DeLeon*, 227 Ill. 2d at 332. That the State's evidence may have also established another motive for defendant's murder of Kathleen, such as financial gain or obtaining sole custody of his sons, is irrelevant to whether the forfeiture by wrongdoing doctrine applies. See *State v. Supanchick*, 323 P.3d 231, 237 (Or. 2014) (forfeiture doctrine applied although the evidence permitted a finding that defendant had more than one purpose in killing his wife); *People v. Banos*, 100 Cal. Rptr. 3d 476, 479 (Cal. Ct. App. 2009) ("That defendant may have also had other motives for the killing (e.g., retribution for infidelity) does not preclude application of the [forfeiture] exception.").[4]

¶ 52    Turning to defendant's intent as to Stacy, the State's theory is that defendant murdered Stacy to prevent her from reporting to police defendant's involvement in Kathleen's murder or testifying at a reasonably anticipated divorce hearing or a murder trial. Defendant argues that the State failed to meet its burden of proof as to his intent, first focusing on the fact that no civil or criminal proceeding was pending at the time of Stacy's alleged murder. The State argues, however, that the absence of pending legal proceedings is not dispositive of the issue of intent and does not preclude application of the forfeiture by wrongdoing doctrine. In resolving this issue we are guided, first and foremost, by the *Giles* opinion.

¶ 53    In *Giles*, which involved application of the forfeiture doctrine in the context of a domestic violence case, the Supreme Court indicated that a defendant's intent to prevent testimony might be inferred from the surrounding circumstances. The Court explained:

"Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the

---

[4]In a footnote, defendant posits that some of Kathleen's hearsay statements were "testimonial" under *Crawford v. Washington*, 541 U.S. 36 (2004), and their admission at trial implicates defendant's confrontation rights under the sixth amendment. As defendant concedes, however, the forfeiture by wrongdoing doctrine "serves both as an exception to the hearsay rule and to extinguish confrontation clause claims." *Hanson*, 238 Ill. 2d at 97; see also *Davis*, 547 U.S. at 833 (rule of forfeiture by wrongdoing extinguishes confrontation clause claims on essentially equitable grounds). In light of our holding that the State met its burden for admission of Kathleen's statements under the forfeiture doctrine, we need not consider this issue further.

crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine." *Giles*, 554 U.S. at 377.

¶ 54　　As the above passage indicates, the Supreme Court expressly contemplated that the forfeiture doctrine could apply not only where the defendant's efforts were designed to prevent testimony at trial, but also where the defendant's efforts were designed to prevent testimony to police, *i.e.*, reporting criminal conduct. See *Banos*, 100 Cal. Rptr. 3d at 491 (holding that under *Giles*, the factual predicate for application of the forfeiture doctrine may be satisfied with evidence that the defendant "(1) intended to stop the witness from reporting abuse to the authorities; or (2) intended to stop the witness from testifying in a criminal proceeding").

¶ 55　　The *Giles* opinion also went on to state that "evidence of ongoing criminal proceedings at which the victim would have been expected to testify" would be "highly relevant." *Giles*, 554 U.S. at 377. The Court did not state that evidence of ongoing criminal proceedings was "necessary" to establish intent.

¶ 56　　When we codified the common-law doctrine of forfeiture by wrongdoing in Illinois Rule of Evidence 804(b)(5), we did not condition the doctrine's application on the existence of a pending legal proceeding. Courts in other jurisdictions, analyzing their own states' forfeiture rules that are essentially identical to our rule, have held that the existence of a pending legal proceeding is not a requirement. *E.g.*, *Supanchick*, 323 P.3d at 238 (holding that "nothing in the text" of Oregon's forfeiture rule "requires that a matter be ongoing when the party acts to eliminate a witness"); *State v. Ivy*, 188 S.W.3d 132, 147 (Tenn. 2006) (holding that Tennessee forfeiture rule, like the federal rule, "is not limited to those cases in which a formal charge or judicial proceeding was pending against a defendant when the declarant's statements were made"); *State v. Hand*, 107 Ohio St. 3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 90 (holding that Ohio forfeiture rule extends to "potential witnesses," and the absence of pending charges at the time the defendant killed the victim did not preclude admission of the victim's statements at trial (internal quotation marks omitted)); see also *United States v. Dhinsa*, 243 F.3d 635, 653 (2d Cir. 2001) (agreeing that under federal Rule 804(b)(6) " 'a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or

potential witness' " (quoting *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999))); *Houlihan*, 92 F.3d at 1279 ("we can discern no principled reason why the waiver-by-misconduct doctrine should not apply with equal force if a defendant intentionally silences a *potential* witness" (emphasis in original)).

¶ 57     Were we to hold otherwise, the equitable underpinnings of the forfeiture by wrongdoing doctrine would be undermined, and the doctrine's very purpose—to prevent a defendant from thwarting the judicial process by taking advantage of his own wrongdoing (*Reynolds*, 98 U.S. at 159; *Rolandis G.*, 232 Ill. 2d at 40)—would be defeated. Equity demands that a defendant who silences a witness, or a potential witness, through threats, physical violence, murder, or other wrongdoing should not be permitted to benefit from such conduct based solely on the fact that legal proceedings were not pending at the time of his wrongdoing.

¶ 58     Because the absence of pending legal proceedings is not a bar to application of the forfeiture by wrongdoing doctrine, the State was not precluded from pursuing its theory that defendant's intent, when he murdered Stacy, was to prevent her from reporting to police defendant's involvement in Kathleen's murder or testifying at a reasonably anticipated divorce hearing or criminal trial.

¶ 59     Before considering the sufficiency of the State's evidence in support of this theory, we consider defendant's argument that testimony from Harry Smith, an attorney, and Neil Schori, a counseling pastor at a nondenominational church in Bolingbrook, should not have been admitted at the pretrial forfeiture hearing. Each man was allowed to testify, over defendant's objection, regarding a conversation he had with Stacy in which she implicated defendant in Kathleen's death.

¶ 60     Defendant objected to Smith's testimony based on the attorney-client privilege. The trial court, however, agreed with the State that defendant lacked standing to assert the privilege, which belonged to Stacy. Because the appellate court did not address the sufficiency of the evidence at the pretrial forfeiture hearing, it did not consider the privilege issue, which the State concedes defendant raised on direct review.

¶ 61     Defendant now renews his objection to the admission of Smith's testimony at the pretrial hearing. Defendant argues that only the client may waive this privilege and, therefore, in the absence of a waiver by Stacy, whom defendant asserts has

never been declared legally dead, Smith's testimony should have been barred. Defendant argues, in the alternative, that the privilege survives death and, in that event, Smith yet had an obligation to assert the privilege on Stacy's behalf. Finally, defendant argues that the trial court was under a duty to ensure that privileged communications are not disclosed.

¶ 62      Defendant's arguments all assume that an attorney-client relationship arose between Smith and Stacy. The record, however, affirmatively demonstrates that such a relationship never materialized.

¶ 63      Smith testified that Stacy telephoned him a few days before her disappearance, and advised that she was seeking a divorce. Smith unequivocally told Stacy that he "could not represent her." Smith believed that "there had to be a conflict" in light of his prior representation of Kathleen. Whether Smith's assessment of the situation was correct is irrelevant. What is relevant is that Smith made plain to Stacy that he "could not represent her." Where a prospective client continues to communicate with the attorney after the attorney's refusal to act for her, she "does not need or deserve the protection of the privilege." 8 John H. Wigmore, Evidence § 2304, at 587 (McNaughton rev. ed. 1961); see also 1 Kenneth S. Broun *et al.*, McCormick on Evidence § 88 n.3, at 540 (7th ed. 2013) ("Of course, statements made after the employment is declined are not privileged."); *People v. Gionis*, 892 P.2d 1199, 1207 (Cal. 1995) (collecting cases and observing that "authorities in other jurisdictions appear to uniformly hold that the attorney-client privilege does not protect statements made after an attorney declines employment"). Accordingly, Stacy's statements that were made after Smith declined to represent her were not privileged and were properly admitted and considered at the pretrial forfeiture hearing.

¶ 64      Smith testified that Stacy told him defendant was "pissed" at her because defendant thought she had told Tom (one of Kathleen's and defendant's sons) that defendant "killed Kathy." Stacy also told Smith that she believed defendant was tracking her via the GPS function on her phone. Smith expressed concern, but Stacy told him defendant did not know about the cell phone she had used to call him. Smith further testified:

> "At some point, I told her she needs to be careful about what she's doing. She told me she had too much expletive on him at the police department so she

wasn't concerned for her safety. *** She said, could we get more money out of [defendant] if we threatened to tell the police about how he killed Kathy. I told her she could be arrested for something like that."

Smith testified that during his conversation with Stacy, he heard defendant call to her and ask what she was doing. When defendant called to Stacy a second time, she ended the conversation.

¶ 65    As to pastor Neil Schori's testimony regarding a conversation he had with Stacy, defendant argued in the trial court that such testimony was barred by the clergy privilege. This statutory privilege provides in relevant part:

"A clergyman or practitioner of any religious denomination accredited by the religious body to which he or she belongs, shall not be compelled to disclose in any court *** a confession or admission made to him or her in his or her professional character or as a spiritual advisor in the course of the discipline enjoined by the rules or practices of such religious body or of the religion which he or she professes, nor be compelled to divulge any information which has been obtained by him or her in such professional character or as such spiritual adviser." 735 ILCS 5/8-803 (West 2008).

¶ 66    The trial court ruled that defendant had no standing to assert the clergy privilege and Schori's conversation with Stacy, which occurred in a public setting (a coffee shop), was not confidential. The appellate court rejected defendant's challenge to the admissibility of Schori's testimony, agreeing with the trial court that the conversation was not confidential. 2015 IL App (3d) 130157, ¶ 199.

¶ 67    Defendant renews his objection to the admission of Schori's testimony at the pretrial forfeiture hearing. The State argues that defendant forfeited review of this issue because he made only a passing reference to it, in a footnote, in his petition for leave to appeal. See *People v. McCarty*, 223 Ill. 2d 109, 122 (2006) ("failure to raise an issue in a petition for leave to appeal results in the forfeiture of that issue before this court"); Ill. S. Ct. R. 315(c) (eff. Jan. 1, 2015) (setting forth requirements for petitions for leave to appeal). A defendant's forfeiture, however, is not a jurisdictional bar to this court's ability to review a matter. *People v. Becker*, 239 Ill. 2d 215, 239 (2010). "When an issue is not specifically mentioned in a party's petition for leave to appeal, but it is 'inextricably intertwined' with other

matters properly before the court, review is appropriate." *Id.* (quoting *People v. McKown*, 236 Ill. 2d 278, 310 (2010)). Defendant argues this is such a case. We agree. Because the admissibility of Schori's testimony is inextricably intertwined with the trial court's ultimate ruling as to whether the State met its burden of proof at the pretrial forfeiture hearing, we will consider the issue.

¶ 68    Defendant argues that whether Schori's testimony is subject to the clergy privilege rests on whether the communication was made in confidence (see *People v. Campobello*, 348 Ill. App. 3d 619, 636 (2004)) and that Schori himself testified that confidentiality was intended and mandated by the "traditions of his church." Defendant's argument is belied by the record. During *voir dire* to determine whether the privilege applied, Schori testified that "no rules" existed regarding his counseling sessions and agreed with the prosecutor that "there were no practices or precepts or customs" of his church to which he was bound with respect to the confidentiality of counseling sessions. The complete absence of any "traditions" is plainly revealed in the following exchange between the prosecutor and Schori:

"Q. In other words, there was no practice, no dictate, nothing from your church that told you what to keep confidential and what not to? That was basically your decision as the first pastoral counselor at Westbrook Church?

A. That's correct.

Q. It had nothing to do with you following any precepts, following any practices, nothing but your own head, correct?

A. That's correct."

¶ 69    Because the record fails to support the factual predicate underlying defendant's argument that the clergy privilege barred Schori's testimony, we reject defendant's argument and will consider Schori's testimony in determining whether the State met its burden of proof at the pretrial forfeiture hearing.

¶ 70    Schori testified that Stacy telephoned him on August 30, 2007, two months before her disappearance. They arranged to meet at a coffee shop the following day. Stacy was anxious, very nervous, and tense, and at times she cried during their meeting. Stacy told Schori that she was afraid of the control defendant had in her life. "She said that she didn't believe she could ever get away from him safely."

- 23 -

Stacy said she loved her children, including Kathleen's children, whom she had adopted, and would never leave without them.

¶ 71       Schori further testified that Stacy told him that on the night Kathleen died, she and defendant had gone to bed but that she woke up and he was not there. Stacy looked for defendant in the house and then made several unsuccessful attempts to reach him on his cell phone. Stacy relayed to Schori that she saw defendant again in the early morning hours, dressed all in black, carrying a bag. Defendant put the contents of the bag—women's clothing—into the washing machine, along with the clothes he was wearing. Stacy determined that the women's clothing was not hers. Stacy told Schori that she was very scared and that defendant coached her for hours on what to say when the police interviewed her. Stacy said that what she told police was a lie. When Schori later learned from a coworker that Stacy was missing, Schori contacted the Illinois State Police.

¶ 72       In addition to the testimony from Smith and Schori, the State presented other evidence at the pretrial hearing that Stacy and defendant were having serious marital issues and that Stacy was contemplating a divorce. Sharon Bychowski, Stacy's neighbor, testified that she spoke to Stacy the week before Stacy disappeared. Stacy told Bychowski that she wanted a divorce and was looking for the right place to bring her children. Stacy also told Bychowski that she had packed 10 boxes of defendant's things but he had refused to leave. Cassandra Cales, one of Stacy's sisters, similarly testified that two days before Stacy's disappearance, Stacy told her she wanted a divorce and was telling her friends that she was consulting with attorneys.

¶ 73       The State also introduced evidence that defendant was aware that Stacy was seeking a divorce. Thomas Morphey, defendant's stepbrother, testified that on Saturday, October 27, 2007, the day before Stacy disappeared, defendant told him that Stacy was cheating on him, that she wanted a divorce, and that she wanted him out of the house by Wednesday. Morphey continued:

> "[H]e said that *** he was due to retire in 14 working days and she was going to take everything from him. She was going to take the kids, all the money that he had earned or half his pension which would mean he would need to then continue to work for the rest of his life."

- 24 -

¶ 74    Special Agent Patrick Callaghan with the Illinois State Police testified that he interviewed defendant the day after Stacy was reported missing. Defendant told Callaghan that he and Stacy had not been getting along and that they were talking about a divorce.

¶ 75    Based on evidence that Stacy was planning to file for divorce, defendant's acknowledgment of their marital difficulties and Stacy's desire for a divorce, defendant's concerns about the financial impact of a divorce, and Stacy's knowledge about defendant's involvement in Kathleen's death, we cannot say that the trial court's finding that the State established, by a preponderance of the evidence, that defendant murdered Stacy, at least in part with the intent to prevent her from reporting to police defendant's involvement in Kathleen's death or testifying at a reasonably anticipated divorce hearing or a murder trial, was against the manifest weight of the evidence. The trial court's finding as to defendant's intent was not "unreasonable, arbitrary, or not based on the evidence presented." *DeLeon*, 227 Ill. 2d at 332.

¶ 76    In sum, we find no error in the admission of Kathleen's and Stacy's hearsay statements at trial pursuant to the doctrine of forfeiture by wrongdoing.

¶ 77                          II. Ineffective Assistance of Counsel

¶ 78    Defendant next argues that he received ineffective assistance of counsel when lead defense counsel, Joel Brodsky, called attorney Harry Smith as a witness at trial, eliciting testimony about Smith's telephone conversation with Stacy in which she implicated defendant in Kathleen's death. Defendant maintains that no sound strategy existed for calling Smith as a witness. The State argues that the trial and appellate courts properly rejected defendant's claim because the decision to call Smith was a strategic attempt to undermine Neil Schori's testimony at trial and, although the strategy ultimately proved unsuccessful, it did not amount to ineffective assistance of counsel.

¶ 79    Both the United States and Illinois Constitutions guarantee a criminal defendant the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Hale*, 2013 IL 113140, ¶ 15. A claim that counsel

provided ineffective assistance is judged under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that his attorney's representation fell below an objective standard of reasonableness and a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000) (citing *Strickland*, 466 U.S. at 687). A " 'reasonable probability' " is " 'a probability sufficient to undermine confidence in the outcome' " of the proceeding. *People v. Simpson*, 2015 IL 116512, ¶ 35 (quoting *Strickland*, 466 U.S. at 694). A failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel. *Id.*

¶ 80        In evaluating defendant's ineffectiveness claim, we are guided by the well-established principle that the decision whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant. *People v. Clendenin*, 238 Ill. 2d 302, 319 (2010); *People v Patterson*, 217 Ill. 2d 407, 442 (2005). Accordingly, such decisions will not ordinarily support a claim of ineffective assistance of counsel. *Patterson*, 217 Ill. 2d at 442; *People v. West*, 187 Ill. 2d 418, 432 (1999). Moreover, a mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective. *People v. Perry*, 224 Ill. 2d 312, 355 (2007). "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.* at 355-56; see also *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 85 (the strong presumption that counsel's strategy was sound may be overcome where counsel's decisions appear to be so irrational that no reasonably effective defense attorney in similar circumstances would pursue such a strategy).

¶ 81        Defendant argues that the record here is silent as to counsel's strategy in calling Smith as a witness. If true, defendant's claim of ineffective assistance of counsel might be better suited to collateral proceedings, such as postconviction review, where defendant and the State would have an opportunity to develop a factual record bearing on the issue. See *People v. Veach*, 2017 IL 120649, ¶¶ 44-46. Our review of the record, however, reveals that it is not silent. At a hearing during trial,

counsel disclosed that his strategy in calling Smith as a witness was to attack Stacy's credibility generally, as well as to undermine Schori's testimony by providing a motive for Stacy to fabricate her claim that defendant was involved in Kathleen's death. The trial record bears out this strategy.

¶ 82 At trial, Neil Schori testified for the State, recounting his August 30, 2007, meeting with Stacy at a coffee shop in Bolingbrook. Schori's trial testimony tracked his testimony at the pretrial forfeiture hearing. Schori testified that Stacy tearfully told him that one night she and defendant went to bed together. When Stacy awoke in the middle of the night, defendant was not in the house, and she was unsuccessful in contacting him by phone. Stacy next saw defendant in the early morning hours, standing at the washing machine dressed all in black, carrying a bag. Defendant placed the clothes he was wearing, along with the contents of the bag, into the washing machine and walked away. Stacy looked inside the washing machine and saw women's clothing that did not belong to her. Afterwards, defendant worked with Stacy for hours, telling her what to say to the police when they interviewed her. Stacy told Schori that she lied to the police on defendant's behalf.

¶ 83 On cross-examination, defense counsel Joseph Lopez engaged in a line of questioning designed to demonstrate that Schori did not believe Stacy when she essentially told him that defendant had killed his ex-wife, Kathleen. Lopez's questioning highlighted that Schori did nothing to prevent Stacy from returning to the residence she shared with defendant, a purported murderer; never made any follow-up calls to Stacy; did not meet with her again; and did not reach out to the Savio family or law enforcement officials, even anonymously, with the information Stacy had shared. Although Schori testified at trial that he believed Stacy, Lopez impeached him with his testimony from the pretrial hearing that it was "possible" that Stacy had lied to him.

¶ 84 During defendant's case in chief, counsel called several witnesses, one of whom was Harry Smith. Under questioning from attorney Brodsky, Smith testified about his telephone conversation with Stacy in late October 2007. Stacy told Smith that she wanted to leave the state with the children and that she had information about defendant that she thought might benefit her in that regard. More specifically, Stacy "wanted to know if the fact [defendant] killed Kathleen" could be used as

leverage in divorce proceedings. The jury also learned that Smith had previously testified that Stacy had asked him, "could we get more money out of [defendant] if we threatened to tell the police about how he killed Kathy," and that Stacy had told him "she had so much S-H-I-T on [defendant] at the police department that he couldn't do anything to her." Smith conceded on direct examination that Stacy had not suggested going to the police. On cross-examination, Smith agreed that Stacy had inquired about getting more money out of defendant by threatening to tell police not only that he killed Kathleen but "how" he killed Kathleen. On redirect, Smith testified that he told Stacy to be careful because she could be arrested. Smith explained that he was referring not to extortion but concealment of a homicide.

¶ 85    In closing argument, Lopez continued the theme that Stacy had lied about defendant's involvement in Kathleen's death simply to gain an advantage in the divorce and that Schori and Smith did not believe her. Lopez argued that Stacy knew that Kathleen's death had been investigated and was found to be an accident but that she "twist[ed]" it into a homicide by starting a "campaign of lies" to "squeeze [defendant] out of money." Lopez argued that this was why Stacy did not go to the police. Lopez further argued that when it appeared to Stacy that Smith did not believe her, she came up with one "last thing," *i.e.*, "something on the Bolingbrook Police Department," which was part of her "campaign of lies."

¶ 86    Defendant raised his ineffectiveness claim in his posttrial motion. The trial court rejected defendant's claim, noting that the decision whether to call Smith was a "balancing test." The court explained:

> "Was it more important to show and destroy Stacy's testimony by the fact she was willing to commit a felony to get at the defendant, to threaten him, to get money from him as opposed to the counter weight of the statement of how he had killed Kathy.
>
>     *** I cannot say that demonstrating that Stacy was an avaricious extortionist willing to commit a felony was not in some circumstance a conceivably sound strategy."

¶ 87    The appellate court also rejected defendant's ineffectiveness claim, finding that the decision to call Smith was clearly a matter of trial strategy "as defense counsel was seeking to discredit the impression of Stacy that Schori's testimony had given

to the jury." 2015 IL App (3d) 130157, ¶ 224. The appellate court rejected defendant's ineffectiveness claim for the additional reason that defendant had not established the prejudice prong of the *Strickland* standard. *Id.* ¶ 225. The appellate court found that the potentially damaging portion of Smith's testimony—that Stacy stated defendant had killed Kathleen—was largely cumulative to the testimony provided by Schori. The appellate court could not say that but for the decision to call Smith, there was a reasonable probability that the result of defendant's trial would have been different. *Id.*

¶ 88 Based on our review of the record in this case, we conclude that defendant has failed to demonstrate that counsel's decision to call Smith as a witness at trial was "not within the realm of trial strategy." *Perry*, 224 Ill. 2d at 355. Whereas Schori's trial testimony portrayed Stacy as an emotional young wife and mother burdened with the knowledge that her husband was involved in Kathleen's death, defendant sought to demonstrate, through Smith's testimony, that Stacy fabricated her allegations against defendant simply to obtain leverage in future divorce proceedings, *i.e.*, that Stacy would lie to extort money from defendant. Although this strategy did not result in a favorable verdict, we must make every effort to eliminate "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. We may not conclude that a particular strategy or tactic was unreasonable simply because it has proved unsuccessful. *Id.* "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

¶ 89 Because defendant has not satisfied the first prong of the *Strickland* standard—that counsel's representation fell below an objective standard of reasonableness—we reject defendant's ineffectiveness claim. See *Simpson*, 2015 IL 116512, ¶ 35 (failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel).

¶ 90 III. Admission of Allegedly Privileged Communications

¶ 91 Defendant makes the additional and independent argument that the trial court erred in allowing the defense to call Harry Smith as a witness at trial because Smith's conversation with Stacy was subject to the attorney-client privilege. As

already discussed in part I *supra*, Stacy's conversation with Smith, after Smith declined representation, was not subject to the attorney-client privilege. Thus, we need not consider this issue further.

¶ 92                                IV. *Per Se* Conflict of Interest

¶ 93        Defendant next argues that his conviction must be reversed and his case remanded for a new trial because defense counsel Brodsky was operating under a *per se* conflict of interest when he entered into a media contract.

¶ 94        Relevant to this issue, the record discloses that on November 14, 2007, defendant appeared on NBC's Today Show. At the time of his television appearance, Stacy had been missing for over two weeks, Kathleen's body had been exhumed, and one of two additional autopsies had been performed. During the Today Show appearance, defendant stated his belief that his silence had painted him guilty in the media. Defendant also expressed concern about the anticipated expense of a legal defense, and asked the "attorneys of America" for help. "If anybody would like to take my case and help me out here, please call." Brodsky responded, and an attorney-client relationship was formed shortly thereafter in mid-November 2007.

¶ 95        A month later, on December 16, 2007, Brodsky and defendant entered into a media contract with Selig Multimedia, Inc. The contract provided that, in exchange for a 15% commission, Selig Multimedia would

> "render all services customarily performed by persons rendering publicity and promotional services in the entertainment industry, including, without limited [*sic*] to, soliciting, procuring and/or negotiating appearances, product endorsements (including commercials), photo opportunities and/or interviews for Peterson and/or Brodsky on television shows, news related television shows, talk shows, panel shows, reality shows and/or any other live or taped appearances, and/or in magazines, newspapers and/or tabloids \*\*\*, and/or soliciting, procuring, and/or negotiating book deals for Peterson and/or Brodsky \*\*\*."

¶ 96 Brodsky's testimony at the hearing on defendant's posttrial motion established that revenue generated under this agreement was limited to a little more than $15,900, consisting of a $10,000 payment in late February 2008 from ABC, two payments from ABC in early March 2008 totalling $1500, and a $5901.18 payment in late March 2008 from an unidentified publisher. Brodsky testified that the publisher's payment was for a "book that Mr. Peterson I guess authored or co-authored regarding his case." Brodsky deposited all revenue into a client trust account and used it to pay his fees and expenses for representing defendant.

¶ 97 By its own terms, the media contract expired on December 15, 2008, approximately five months before defendant was indicted for Kathleen's murder.

¶ 98 The trial court rejected defendant's conflict-of-interest argument. The court stated during its oral ruling that the idea that someone needs to get ahead of a news story is not unusual, and "if Mr. Brodsky and Mr. Peterson believed that the best way to address his matter preindictment was to get ahead of this story, *** by seeking out media attention and somebody that would assist you to do that again is not unusual." The trial court concluded that the existence of the media contract did not prevent defendant from presenting a defense, receiving a fair trial, or receiving the effective assistance of counsel.

¶ 99 On direct review, the appellate court also rejected defendant's argument. 2015 IL App (3d) 130157, ¶ 217. The appellate court held that the alleged conflict created by the media contract did not fall within any of the categories of *per se* conflicts established by this court and, regardless of whether Brodsky's conduct in entering into the media contract constituted a violation of the Illinois Rules of Professional Conduct, no *per se* conflict of interest arose. *Id.* The appellate court also held that *People v. Gacy*, 125 Ill. 2d 117 (1988), on which defendant relied, did not mandate that a *per se* conflict of interest be found in this case. 2015 IL App (3d) 130157, ¶ 218. The appellate court explained:

"Although our supreme court indicated in *Gacy* that a *per se* conflict of interest might very likely arise if the defense attorney enters into a book deal about the case during the course of the representation, it did not involve or address a situation such as that involved in the present case—where a potential defendant and his attorney, acting in concert, jointly enter into a media rights contract with a media company prior to criminal charges being brought against the potential

- 31 -

defendant as a strategy to try to head off a possible indictment by getting ahead of the story in the media." *Id.*

¶ 100    Defendant argues that the appellate court misconstrued *Gacy* and failed to take into account that the media contract was a clear violation of Rules 1.7 and 1.8 of the Illinois Rules of Professional Conduct. The State argues, in line with the appellate court, that *Gacy* did not hold that the existence of a media contract creates a *per se* conflict of interest and that this court should be circumspect about recognizing such a rule. The State also argues that any alleged violation by Brodsky of the Illinois Rules of Professional Conduct is a matter for the Attorney Registration and Disciplinary Commission.

¶ 101    The parties agree that the facts relevant to the conflict-of-interest issue are not in dispute. Accordingly, the issue is one of law, which we review *de novo*. *People v. Fields*, 2012 IL 112438, ¶ 19.

¶ 102    A criminal defendant's sixth amendment right to the effective assistance of counsel includes the right to conflict-free representation. *People v. Nelson*, 2017 IL 120198, ¶ 29; *Fields*, 2012 IL 112438, ¶ 17. Such representation means "assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations." *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988). Two categories of conflict of interest exist: *per se* and actual. *Fields*, 2012 IL 112438, ¶ 17.

¶ 103    A *per se* conflict of interest exists where "facts about a defense attorney's status *** engender, *by themselves*, a disabling conflict." (Emphasis in original.) *Spreitzer*, 123 Ill. 2d at 14; accord *Fields*, 2012 IL 112438, ¶ 17. Pursuant to long-standing precedent, this court has recognized that a *per se* conflict of interest exists in the following situations: "(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved with the prosecution of defendant." *Fields*, 2012 IL 112438, ¶¶ 18, 41.[5] The justification for treating these conflicts as *per se* conflicts

---

[5]Peculiar to juvenile prosecutions, we have also held that a *per se* conflict of interest arises when defense counsel also acts as guardian *ad litem*. *People v. Austin M.*, 2012 IL 111194, ¶¶ 83-86.

is that, in each situation, the defense counsel's association or tie to the victim, the prosecution, or a prosecution witness may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate. *People v. Austin M.*, 2012 IL 111194, ¶ 81; *People v. Hernandez*, 231 Ill. 2d 134, 143 (2008); *People v. Washington*, 101 Ill. 2d 104, 110-11 (1984).

¶ 104    Unless a defendant waives his right to conflict-free representation, the existence of a *per se* conflict of interest is grounds for automatic reversal. *Fields*, 2012 IL 112438, ¶ 18; *Hernandez*, 231 Ill. 2d at 143. In other words, where a *per se* conflict exists, a defendant need not show that counsel's performance was in any way affected by the existence of the conflict. *Id.*

¶ 105    Where a defendant has not established that a *per se* conflict of interest arose, reversal of the defendant's conviction requires a showing of an actual conflict. *Austin M.*, 2012 IL 111194, ¶ 81. To succeed on an actual conflict-of-interest claim, the defendant must establish that the conflict adversely affected counsel's performance. *Id.* ¶ 82.

¶ 106    Defendant here argues that defense counsel Brodsky labored under a *per se* conflict of interest when he entered into the contract with Selig Multimedia. In essence, defendant is asking this court to recognize a new situation, in addition to those identified above, under which a *per se* conflict of interest would arise. In support, defendant cites our opinion in *Gacy*.

¶ 107    In *Gacy*, we considered the defendant's *pro se* postconviction claim that a conflict of interest arose when defense counsel was offered a $6 million book deal. Counsel declined the offer, but the defendant maintained that " 'the seed was planted as to how much money was or could be made' " and from that point forward, counsel was more concerned about keeping records of the case than preparing the defense. *Gacy*, 125 Ill. 2d at 134. We declined to find either a *per se* conflict of interest, or an actual conflict of interest. *Id.* at 136.

¶ 108    Although we recognized that an attorney's acquisition of a financial stake in the litigation directly adverse to the client's interests would give rise to a *per se* conflict, we held that the mere fact that defense counsel was offered but declined a book deal was an insufficient basis on which to find such a conflict. *Id.* at 135-36. We also held that the defendant failed to establish an actual conflict because the

defendant failed to point to specific identifiable deficiencies in counsel's performance resulting from counsel's recordkeeping, which itself had legitimate purposes. *Id.* at 136.

¶ 109    *Gacy* did not consider a media contract like the one at issue here, and nothing in *Gacy* signals that an attorney who, with his client, enters into such a contract necessarily acquires a financial stake in the case "directly adverse" to the client's interests. *Id.* at 135. At most, *Gacy* intimates that where defense counsel accepts a book deal or acquires other publication rights during the course of his representation, a *per se* conflict of interest might arise. That did not occur in this case. Thus, defendant's reliance on *Gacy* is misplaced.

¶ 110    Defendant also argues that a *per se* conflict of interest arose because defense counsel's conduct in entering into the media contract was a clear violation of Rules 1.7 and 1.8 of our Rules of Professional Conduct. The version of Rule 1.7 that was in effect at the time Brodsky and defendant entered into the contract with Selig Multimedia prohibited a lawyer from representing a client if such representation "may be materially limited *** by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after disclosure." Ill. R. Prof'l Conduct R. 1.7(b) (eff. Aug. 1, 1990). Rule 1.8 also prohibited an attorney from entering into any arrangement with a client "by which the lawyer acquires an interest in publication, media, or other literary rights with respect to the subject matter of employment," unless the employment has been concluded. Ill. R. Prof'l Conduct R. 1.8(b) (eff. Aug. 1, 1990).[6]

¶ 111    Whether defense counsel's conduct in entering into the media contract violated the foregoing rules is not as clear as defendant maintains. We observe, for example, that although defense counsel's acquisition of publication rights during the course of representing defendant would have violated Rule 1.8, the media contract at issue here did not, itself, create such rights. Indeed, the contract focused primarily on generating publicity through television appearances and the print media

---

[6]The Illinois Rules of Professional Conduct, adopted February 8, 1990, and effective August 1, 1990, which were in effect at the time of the entry of the media contract, have been repealed and replaced by the Illinois Rules of Professional Conduct of 2010, effective January 1, 2010.

preindictment. Thus, some uncertainty exists as to whether this type of media contract falls squarely within the prohibition of Rule 1.8.

¶ 112 We also observe that defendant's claim that counsel's entry into the contract violated Rule 1.7 is not well documented in the record. Defendant maintains that no strategic purpose existed to enter into the media contract and that Brodsky was motivated by the "five-star hotel stays, meals, and spa treatments for him and his wife, along with cash and other benefits" that they received in conjunction with the personal appearances. These assertions, if true, might be indicative that defense counsel's representation was "materially limited" by counsel's "own interests," in violation of Rule 1.7. But the only citation to the record defendant provides in support of these assertions is citation to oral argument by another member of his defense team during the hearing on defendant's posttrial motion. We will not rely on factual assertions made in a party's own argument that are not otherwise established in the record. See *People v. Barner*, 2015 IL 116949, ¶ 69 n.4 ("We obviously cannot rely upon a factual representation made in the background section of a party's own motion which cannot be independently established in the record.").

¶ 113 In sum, even if we accept defendant's argument that a clear violation of Rules 1.7 and 1.8 could give rise to a *per se* conflict of interest, any conclusion by this court as to a rule violation in this case would be completely speculative. Indeed, the proper forum to resolve a claim that counsel has violated our Rules of Professional Conduct is the Attorney Registration and Disciplinary Commission, whose officers, acting as the agents of this court, administer the disciplinary functions that we have delegated to them. *In re Mitan*, 75 Ill. 2d 118, 123-24 (1979); see also Ill. S. Ct. R. 751(a) (eff. Jan. 17, 2013) (attorney disciplinary proceedings "shall be under the administrative supervision of an Attorney Registration and Disciplinary Commission"); *People v. Camden*, 210 Ill. App. 3d 921, 926 (1991) ("Attorney disciplinary proceedings are conducted by the ARDC completely separate and apart from the judicial proceedings in which the attorney misconduct was alleged to have occurred.").

¶ 114 For these reasons, we reject defendant's argument that a *per se* conflict of interest arose in this case. We will not expand the situations already recognized by this court in which a *per se* conflict of interest exists.

¶ 115    In the absence of a *per se* conflict of interest, reversal of defendant's conviction requires a showing of an actual conflict of interest. *Austin M.*, 2012 IL 111194, ¶ 81. Defendant, however, has not argued below or in this court that an actual conflict of interest arose when counsel entered into the media contract. Accordingly, defendant has forfeited any such argument. See *People v. Denson*, 2014 IL 116231, ¶ 11; *People v. Williams*, 235 Ill. 2d 286, 298 (2009).

¶ 116                              V. Evidence of Prior Bad Acts

¶ 117    Defendant next argues that the trial court abused its discretion and committed reversible error when it allowed the State to introduce bad-acts evidence, notwithstanding the State's failure to comply with the notice requirements of Illinois Rule of Evidence 404. This rule allows the admission of bad-acts or other-crimes evidence under certain circumstances but requires the State to disclose its intent to introduce such evidence "at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." Ill. R. Evid. 404(c) (eff. Jan. 1, 2011).

¶ 118    The bad-acts evidence at issue here involved the testimony of Jeffrey Pachter. As discussed in part I *supra*, Pachter testified at the pretrial forfeiture hearing regarding a conversation with defendant in the winter of 2003, during which defendant offered him $25,000 to find someone that could have his "third wife taken care of." Prior to trial, the State filed a motion to admit bad-acts or other-crimes evidence but did not reference Pachter's testimony in that motion. The State, however, included Pachter's name on its witness list that was provided to defendant on July 24, 2012.

¶ 119    On July 31, 2012, during the State's opening statement at trial, the State told the jury that defendant had a conversation with a friend "where he offered him $25,000." Before the State could go any further, defendant objected. At a side bar, defendant argued that Pachter's testimony was evidence of a prior bad act that the State had not included in its pretrial motion and Pachter's testimony was thus inadmissible. Defendant urged the court to declare a mistrial. The trial court sustained defendant's objection but would not declare a mistrial. The State

completed its opening statement without further reference to defendant's conversation with Pachter, and the trial proceeded.

¶ 120    Two days later, on August 2, 2012, the State filed a motion *in limine* to admit Pachter's testimony at trial. The State, relying on *People v. Morales*, 2012 IL App (1st) 101911, ¶ 25, argued that evidence of defendant's offer to pay Pachter $25,000 to have his wife killed was part of defendant's "course of conduct" leading up to the crime charged and, as such, it was "intrinsic evidence" of the charged offense and not subject to the notice requirement of Illinois Rule of Evidence 404. The State argued in the alternative that even if Pachter's testimony was evidence of a prior bad act, the State had provided constructive notice to defendant. The State explained:

> "In this case, in 2010 the People disclosed Pachter's name, statements, a summary of the substance of the testimony, and in fact, his testimony was part of the 2010 [forfeiture] hearing, wherein defendant had an opportunity to cross-examine the witness. Pachter's name is on the People's trial witness list. This satisfies the notice requirement of Rule 404 ***."

¶ 121    After briefing and argument, on August 14, 2014, the trial court ruled that testimony regarding defendant's alleged offer to pay $25,000 to have Kathleen killed was evidence of a prior bad act subject to the notice requirements of Illinois Rule of Evidence 404. The State maintained, however, that its late notice should be excused in light of its reasonable but mistaken belief that the evidence was not subject to Rule 404, as well as its provision of constructive notice to defendant of Pachter's testimony. The trial court ultimately concluded that good cause had been shown, and the court extended the deadline for providing notice to defendant to August 14, 2012. Thus, the State's August 2, 2012, notice to defendant, provided in its motion *in limine*, was timely.

¶ 122    A week later, on August 21, 2012, after a hearing, the trial court ruled that the State could introduce Pachter's testimony at trial as evidence of defendant's intent. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (bad-acts evidence may be admissible "as proof of *** intent"). The next day, the State called Pachter as a witness at trial. Defendant did not request a continuance. On direct examination, Pachter testified that defendant asked him, during a ride along in his police vehicle, if Pachter "could

find someone to take care of his third wife." Defendant requested a sidebar, after which the court admonished the jury as follows:

"Ladies and gentlemen, the following instruction is applicable to the testimony that's about to be elicited, and evidence is going to be received that the defendant has been involved in conduct other than that charged in the indictment. This evidence will be received on the issue of the defendant's intent, and it may be considered by you only for that limited purpose. It's for you to determine whether the defendant was involved in the conduct, and, if so, what weight should be given to this evidence on the issue of intent."

The State completed its examination of Pachter. Defendant conducted a lengthy cross-examination, challenging Pachter's credibility and suggesting that Pachter did not, in any event, take defendant's alleged offer seriously.

¶ 123　　In his posttrial motion and again on direct review, defendant unsuccessfully challenged the admission of Pachter's testimony at trial. 2015 IL App (3d) 130157, ¶ 210. The appellate court held that the trial court did not abuse its discretion, noting that Pachter's testimony was not presented until August 22, 2012, a full 20 days after the State gave notice, defendant did not request a continuance, and defendant fully examined Pachter. *Id.*

¶ 124　　Illinois Rule of Evidence 404 provides in relevant part:

"(b) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith ***. Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident.

(c) In a criminal case in which the prosecution intends to offer evidence under subdivision (b), it must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." Ill. R. Evid. 404 (eff. Jan. 1, 2011).

¶ 125　　A trial court's ruling on a motion to admit other-crimes evidence is reviewed for an abuse of discretion. *People v. Chapman*, 2012 IL 111896, ¶ 19; *People v.*

*Donoho*, 204 Ill. 2d 159, 182 (2003). The question is not whether the reviewing court would have made the same decision if it were acting as the trial court. Rather, the question is whether the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32. The abuse-of-discretion standard of review is highly deferential. *Lerma*, 2016 IL 118496, ¶ 32. Thus, we will not reverse the trial court's ruling here absent a clear abuse of that discretion. *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010).

¶ 126 We note that defendant does not challenge the trial court's ruling that Pachter's testimony was admissible as evidence of defendant's intent. Rather, defendant only challenges the trial court's decision to excuse the State's failure to provide pretrial notice under Rule 404. As to that issue, defendant first argues that the trial court's initial ruling barring the State from introducing Pachter's testimony "reassured" the defense that Pachter's testimony would not be admitted and that the defense was "unprepared" for the trial court's "about face" on this matter. The fact that defendant did not anticipate the trial court's ultimate ruling is not a basis for finding an abuse of discretion. Moreover, the trial court's so-called "about face" occurred only after the State's motion to admit Pachter's testimony had been fully briefed and argued by the parties and after the court carefully considered the applicability of Rule 404, the existence of good cause, and the general admissibility of Pachter's testimony.

¶ 127 Defendant next argues that the trial court erroneously equated the provision of "constructive notice" with the establishment of "good cause" under Rule 404. The record discloses that although the trial court considered the State's argument that it provided constructive notice to defendant of its intent to introduce bad-acts evidence through Jeffrey Pachter, the trial court did not equate the two concepts.

¶ 128 Finally, defendant argues that the trial court's ruling eviscerated the purpose of Rule 404's pretrial notice requirement, namely, to prevent prejudice by giving the defense time to prepare its own case around the bad-acts evidence. In support, defendant cites *United States v. Skoczen*, 405 F.3d 537 (7th Cir. 2005). There, the federal court of appeals agreed with the defendant that the government should have provided proper pretrial notice of its intent to introduce bad-acts evidence at trial, stating that "[t]he point of the pretrial notice is to prevent undue prejudice and

surprise by giving the defendant time to meet such a defense." *Id.* at 548. The court of appeals noted, however, that the defendant had not explained how he was prejudiced by the lack of notice and observed that the defendant "could have asked for a continuance, but he did not." *Id.* The court of appeals ultimately found no reversible error in the district court's decision to admit the bad-acts evidence. *Id.*

¶ 129    Here, defendant suggests that he had inadequate time to prepare for Pachter's testimony. But defendant was already aware of the substance of Pachter's testimony, since Pachter had previously testified at the pretrial forfeiture hearing. Moreover, like defendant Skoczen, defendant did not ask for a continuance for further preparation, and as the appellate court observed, defendant appears to have fully cross-examined Pachter about his conversation with defendant and about matters related to Pachter's credibility. 2015 IL App (3d) 130157, ¶ 210. Under these circumstances, we find no abuse of discretion in the trial court's ruling.

¶ 130                              VI. Cumulative Error

¶ 131    Having rejected defendant's claims of error, we need not consider defendant's argument that cumulative error denied him a fair trial.

¶ 132                                CONCLUSION

¶ 133    For the reasons discussed above, we affirm the judgment of the appellate court affirming defendant's conviction and sentence for the first degree murder of Kathleen Savio.

¶ 134    Affirmed.