2020 IL App (1st) 170051-U

FIFTH DIVISION
Order filed: March 13, 2020

No. 1-17-0051

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 1080 |
| | ) | |
| VERNAL L. ODOM, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirmed the defendant's convictions for aggravated kidnapping and aggravated vehicular hijacking over his contentions that (1) the trial court erroneously admitted other-crimes evidence; (2) the State failed to prove him guilty beyond a reasonable doubt because the witnesses were unreliable and impeached; (3) the State failed to prove aggravated kidnapping because any asportation was incident to the other offense and there was no intent to secretly confine the victim; (4) the defendant was deprived of his right to conflict-free counsel; and (5) his sentence was excessive.

¶ 2 Following a jury trial, the defendant, Vernal Odom, was convicted of aggravated kidnapping and aggravated vehicular hijacking and sentenced to concurrent terms of 40 years' imprisonment. He now appeals, arguing that (1) the trial court erred when it allowed the State to admit evidence of other crimes, *i.e.*, the unreported and uncharged kidnapping that occurred prior to the charged incident; (2) the State failed to prove him guilty beyond a reasonable doubt because the civilian witnesses were incredible; (3) the State failed to prove him guilty as a matter of law because the actions alleged did not constitute aggravated kidnapping where the asportation was incidental to the aggravated vehicular hijacking and there was no intent to secretly confine the victim; (4) he was deprived of his right to conflict-free counsel where the trial court denied counsel leave to withdraw after the defendant filed an Attorney Registration and Disciplinary Committee (ARDC) complaint against him; and (5) his sentence was excessive. For the reasons that follow, we affirm.

¶ 3 We set forth the facts necessary to provide background for the defendant's several claims of error. Additional facts will be included as needed in later sections of this order.

¶ 4 The defendant, and codefendant Marcellus Mitchem, were charged by indictment with, *inter alia*, aggravated vehicular hijacking and the aggravated kidnapping of Antwain Avery.[1] Both charges were based on an accountability theory and predicated on the codefendant being armed with a firearm during the commission of the offenses.

¶ 5 The State also filed a motion *in limine*, seeking to admit evidence of the defendant's prior crimes for the purposes of proving identification, intent, motive, and lack of mistake. Specifically,

---

[1] The codefendant Marcellus Mitchem appealed separately, and this court affirmed his convictions for aggravated kidnapping and aggravated vehicular hijacking. *People v. Mitchem*, 2019 IL App (1st) 162257.

the State sought to introduce evidence of an incident, which occurred approximately three months prior to the events giving rise to the charged offenses, where the defendant and the codefendant invited Avery out to lunch and then led him to a vacant apartment where they held him for ransom at gunpoint. The defendant objected, arguing that the prior incident was not factually similar to the instant offenses, the State was not required to prove motive, and the identity of the perpetrators of the instant offenses was not at issue. The circuit court granted the State's motion and admitted the other crimes evidence for the purposes of proving intent, motive, knowledge, and identification.

¶ 6       At trial, Avery testified that, on November 8, 2013, he arrived at his apartment complex in a Chevrolet Malibu. After he parked in his usual spot, a white sports utility vehicle (SUV) with three occupants pulled directly behind him, blocking his exit. Two men exited the SUV and approached him. Both of the men were armed with a gun and wore a mask and gloves. The men told him to get out of the car and attempted to open his driver side door. He locked his door and then fled out of the passenger door. The smaller of the two masked men pursued him and tackled him in the courtyard of the apartment building. The man then hit him with a hard object in the back of the head and he blacked out.

¶ 7       When Avery came to, the two masked men were attempting to place him, feet first, into their SUV. He struggled to free himself and the two offenders dropped him. He then saw the third perpetrator, the driver of the SUV, whom he identified as the defendant. Avery once again attempted to flee, but both of the masked offenders dragged him back to the SUV. The men returned him to the SUV and threatened to kill him. The two men again tried to force him into the SUV. During the struggle, Avery removed the mask off of one of the perpetrators, whom he

identified as the codefendant. According to Avery, he had known both the defendant and codefendant for over 20 years and considered them to be his "brother[s]."

¶ 8    Avery continued to struggle with the codefendant and the other masked man. He freed himself and attempted to flee but was quickly caught and returned to the SUV. Once there, he heard the defendant say, "Hurry up. Let's get the f*** out of here. Just shoot him." The codefendant, standing approximately a foot away from him, then pointed a silver, automatic "pistol" at his head and said, "I'm going to kill him." Avery testified that the other perpetrator was armed with a black automatic pistol. Avery fled and this time no one gave chase. As he fled, Avery turned to see the codefendant entering his vehicle and driving away.

¶ 9    Avery further testified to a prior incident, during which the defendant and the codefendant held him for ransom. According to Avery, in late August or early September of 2013, the defendant and the codefendant invited him to lunch. He arrived at the restaurant in a separate car from the defendant and the codefendant. Once there, the three men drove together to an apartment building. They went inside and entered what Avery described as a "vacant looking" apartment. After he spoke with the defendant and the codefendant for a few minutes, the two men displayed guns, bound him, and directed him to call his fiancée, Camille Colbert. The codefendant told him that he would be shot if he did not follow their directions. Avery was instructed to tell Colbert to "give up" everything that he had in their apartment, including cash, jewelry, and the title to a Chevrolet Impala. Avery, who sold drugs, had a bag that contained $100,000 in cash in his apartment. He was then instructed to tell Colbert to leave the bag of money at a nearby restaurant. After the phone call, the defendant left the apartment. When the defendant returned, he had with him the duffle bag of cash from Avery's apartment. Avery watched the defendant and the codefendant divide the cash

from the duffle bag and then the two discussed whether to kill him or let him go. Eventually, they decided to let him go. Avery did not report the incident to the police due to the illegal source of the money. He eventually told the State's Attorney's office about the incident in October 2015.

¶ 10    Colbert, Avery's fiancée, testified that, on November 8, 2013, she looked out from her apartment balcony and saw three men "tussling" outside. One of the men yelled out for help and she realized that it was Avery. Colbert ran inside and called the police. When she returned to observe the scene, Avery and the other men were standing near a white SUV that was blocking Avery's car. Colbert recognized the codefendant as one of the men standing near Avery. She also recognized the defendant as the driver of the white SUV and heard him say, "Pop his ass. Shoot his ass." Colbert saw the white SUV and Avery's car drive away. When Avery eventually returned to the apartment, his clothes were "ripped off." Colbert testified that she had known the defendant and the codefendant for 18 years and that she was "one thousand percent" sure that they were the offenders.

¶ 11    The State published the audio recording of Colbert's 9-1-1 phone call to the jury. During the call, Colbert says that she cannot identify the perpetrators. Later in the call, she identified both the defendant and the codefendant as two of the perpetrators.

¶ 12    Colbert also testified to the prior incident where Avery was held for ransom. According to Colbert, Avery called her that day and told her that he needed her to do something and would call her back shortly. Around this time, Colbert looked outside her apartment window and saw the defendant walk past. Shortly thereafter, Avery called her back and told her to retrieve a bag hidden in the closet, some jewelry, and the title to her car. He then instructed her to place the bag in the dumpster of a nearby restaurant. Colbert complied, but was unable to find the title to her car. She

then went to the restaurant, but the dumpster was too visible to the public. Another individual spoke to her from Avery's phone and directed her to drop the bag at another location, which she did.

¶ 13   On cross-examination, Colbert denied telling Detective Alan Pieczul that she could not identify the offenders. She testified that Pieczul coached her to lie to the ASAs so that she would not have to testify in court.

¶ 14   Calumet City police officer, Kory Bland testified that he was dispatched to Avery's apartment complex. When he arrived, Avery was sitting down. He was out of breath, shirtless, and sweating. He had pants on and had grass stuck to his pants.

¶ 15   The circuit court granted the State's motion to introduce its exhibits into evidence, after which the State rested.

¶ 16   The defendant moved for a directed verdict, which the circuit court denied. Neither the defendant, nor the codefendant testified on their own behalf.

¶ 17   Calumet City police detective Alan Pieczul testified that he investigated the incident and interviewed Colbert. She said she could not identify the men that she saw fighting with Avery in the parking lot. She said she did not see their faces. Pieczul denied telling Colbert to lie about being able to identify the offenders.

¶ 18   The attorneys presented closing arguments and the jury found the defendant guilty of aggravated kidnapping and aggravated vehicular hijacking.

¶ 19   After trial, trial counsel moved for leave to withdraw as counsel for defendant. Trial counsel alleged that the defendant had filed an ARDC complaint against him. Counsel further indicated that the complaint alleged that counsel had conspired with a relative of Avery to ensure

a conviction and that it was implied that counsel accepted money to "throw" the case. Trial counsel indicated that he had responded to the complaint and that the matter was still pending. When asked for his position, the defendant indicated that he did not want his attorney to withdraw. The defendant admitted that he thought trial counsel set him up, and that he had accused counsel of criminal behavior. However, the defendant indicated that he did not want counsel to withdraw because he knew the facts of the case. The trial court subsequently denied trial counsel's motion to withdraw.

¶ 20    The defendant's presentence investigation (PSI) was received by the trial court. The PSI reveals that the defendant had 10 prior felony convictions, including possession of a controlled substance, delivery of a controlled substance, and possession of a firearm by a felon. His most recent felony was a federal charge of felon in possession of a firearm for which he was sentenced to 63 months' incarceration followed by 36 months' supervised release. The defendant was serving his term of supervised release when he was charged with the crimes for which he was convicted. The State argued that he should be sentenced to the 45-year maximum sentence on each offense.

¶ 21    After the attorneys presented argument regarding the sentence, the trial court asked the defendant if he had anything he would like to say before sentencing. The defendant responded: "I got a lot of issues that hasn't been addressed for the grounds for my appeal." When questioned further by the trial court, the defendant alleged that trial counsel had failed to call alibi witnesses. Trial counsel responded: "I was told about an alibi witness, and the alibi witness did not confirm his alibi." Trial counsel continued: "I saw copies of her statement where she indicated that she was not with him," and added "I was not going to engage in knowingly suborning perjury." After hearing additional allegations of trial error from the defendant, the trial court concluded:

"As to the alibi, [trial counsel] had in his possession interview forms that the State's Attorney's investigator had regarding these witnesses, and he made a decision at that time based on the fact [*sic*] that they gave, and it would not be a valid alibi defense. And decided in his trial strategy not to call this witness."

The trial court then addressed the defendant's other contentions of error and sentenced the defendant to concurrent terms of 40 years' imprisonment, which included a 15-year enhancement based on the use of a firearm. This appeal followed.

¶ 22 The defendant first contends that the trial court erred when it allowed the State to introduce evidence of an earlier kidnapping committed approximately three months prior to the charged offense. The State responds that the evidence was properly admitted to show identity, intent, and motive. We agree with the State.

¶ 23 Evidence of other crimes, wrongs, or bad acts is generally not admissible to prove a criminal defendant's criminal propensity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Evidence of other crimes, however, is admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan 1, 2011). However, even when such evidence is offered for a permissible purpose and not solely for propensity, such evidence will not be admitted if its prejudicial impact substantially outweighs its probative value. *People v. Mitchem*, 2019 IL App (1st) 162557, ¶ 40 (citing *People v. Pikes*, 2013 IL 115171, ¶ 11). A circuit court's decision to admit other-crimes evidence is reviewed for an abuse of discretion. *People v. Patterson*, 2017 IL 120331, ¶ 125.

¶ 24 In this case, we find no reason to depart from the reasoning we employed in the codefendant's case. See *Mitchem*, 2019 IL App 1st 162257, ¶ 41. The record shows that the circuit

court granted the State's motion *in limine*, allowing the State to introduce evidence of the defendant's prior kidnapping of Avery for the purpose of showing identity, intent, and motive. We find that the prior kidnapping of Avery was highly relevant to establish the motive of the defendant in targeting Avery. According to Avery, he had known the defendant and the codefendant for over 20 years. Without the prior kidnapping incident, the trier of fact might be left to wonder what would motivate two men, whom Avery considered his "brothers," to kidnap him and hijack his car. As the evidence of the prior kidnapping established, the defendant and the codefendant successfully held Avery for ransom just a few months prior to the charged offenses. Thus, the other-crimes evidence was highly relevant to establishing that the defendant's and the codefendant's motive, from the beginning, was to once again kidnap Avery and hold him for ransom. Additionally, the prior kidnapping also established that the defendant and the codefendant specifically targeted Avery's Chevrolet Malibu, as they had previously demanded the title to Colbert's car as part of the ransom, which again speaks to their motive in carrying out the charged offenses. In short, the evidence of the defendant's other crimes was highly probative of his motive for both the kidnapping and hijacking. See *People v. Heard*, 187 Ill. 2d 36, 59 (1999) (holding that evidence of the defendant's continued hostility and animosity toward his ex-wife and her new boyfriend was admissible to prove the defendant had motive to murder them). Because we cannot say, as a matter of law, that the probative value of the other-crimes evidence was substantially outweighed by the danger of unfair prejudice, we find no abuse of discretion in the admission of the evidence of the defendant's prior kidnapping of Avery.

¶ 25 Next, the defendant raises two challenges to the sufficiency of the evidence. He argues that both his aggravated kidnapping and aggravated vehicular hijacking convictions must be overturned

because the two civilian witnesses, Avery and Colbert, were incredible. He also argues that his aggravated kidnapping conviction must be overturned, as a matter of law, because the evidence presented did not establish an asportation or intent to secretly confine Avery. We disagree.

¶ 26    We first address the defendant's argument that the evidence presented was so filled with inconsistencies and fabrications that it was impossible for any reasonable trier of fact to accept any of it. The fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) requires proof beyond a reasonable doubt of every element of a criminal offense. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (citing *In re Winship*, 297 U.S. 358, 364 (1970)). The question is " 'whether, after viewing the evidence in the light most favorable to prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 433 U.S. 307, 319 (1979)). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *People v. Cooper*, 194 Ill. 2d 419, 431 (2000)). The reviewing court must carefully examine the evidence but must do so, recognizing, that it was the trier of fact who saw and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). However, the fact that a judge or jury accepted certain testimony does not guarantee that it was reasonable to do so, and reasonable people may on occasion act unreasonably. *Id.* Therefore, a fact finder's decision to accept testimony is entitled to great deference, but is not conclusive. *Id.*

¶ 27    Here, the defendant argues that Colbert's testimony is unworthy of belief because she admitted that she lied to assistant state's attorneys (ASAs) by telling them that she could not identify the offenders. However, at trial, she testified that she had known the defendant and the

codefendant for years and was "one thousand percent" sure of their identities. The defendant further notes that Colbert's testimony was inconsistent with Detective Pieczul and Avery's testimony. Defendant notes both men denied telling Colbert to tell the ASAs that she could not identity the offenders in hopes that she would not be called to testify.

¶ 28     The defendant also argues that Avery's testimony was inconsistent with Officer Bland's testimony. The defendant notes Avery testified that his clothes were ripped off during the vehicular hijacking and that his hands and knees were scraped, but Officer Bland testified that Avery was wearing grass-stained pants when he first encountered him and did not notice cuts or bruises.

¶ 29     We have reviewed these and other alleged inconsistencies in the testimony and cannot conclude that the jury acted irrationally when it implicitly accepted Avery and Colbert's testimony regarding the kidnapping and vehicular hijacking incident. We acknowledge that there were inconsistencies in the testimony and note that trial counsel argued these inconsistencies to the jury. However, we cannot conclude that these inconsistencies and alleged fabrications are so significant that we can overturn the findings of the jury, the trier of fact that observed these witnesses testify. Therefore, we must reject the defendant's invitation to overturn his convictions as not proven beyond a reasonable doubt.

¶ 30     The defendant also argues that the State failed, as a matter of law, to prove him guilty of aggravated kidnapping because there was no asportation of the victim. The offense of kidnapping may be committed in one of three ways: (1) confinement of the victim, (2) asportation of the victim, or (3) inducement of the victim. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). The indictment charged the defendant with kidnapping by accountability under an asportation theory, alleging the codefendant "knowingly by force or threat of imminent force carried Antwain Avery

from one place to another with intent secretly to confine Antwain Avery against his will *** while armed with a firearm." See 720 ILCS 5/10-2(a)(6) (West 2012). The defendant was tried under an accountability theory. A person is legally accountable for the actions of another if: "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2 (West 2012).

¶ 31    In *Mitchem*, we addressed a nearly identical challenge to the codefendant's conviction for aggravated kidnapping. See *Mitchem*, 2019 IL App (1st) 162257, ¶¶ 26-27. We find that that reasoning applies with equal force to the defendant's conviction by accountability. Avery testified that the codefendant and an unknown individual, both of whom were armed with firearms and wearing masks and gloves, attempted to remove him from his car. He fled, the codefendant chased him, and tackled him. Someone struck him in the back of the head with a hard object. Avery awoke, after briefly losing consciousness, to find that the codefendant and the other unknown perpetrator were attempting to place him, feet first, inside an SUV. The defendant was sitting in the driver's seat encouraging the principals to hurry up. Illinois courts have "most commonly" found secret confinement when the victim is enclosed in "a house or a car." *People v. Sykes*, 161 Ill. App. 3d 623, 628 (1987). Therefore, viewing the evidence in the light most favorable to the State, we conclude that a rational jury could find, beyond a reasonable doubt, the codefendant used force and transported Avery with the intention of secretly confining him in the SUV the defendant was driving. We further conclude that a rational jury could find that the defendant was criminally liable for the acts of the codefendant and the unknown perpetrator.

¶ 32     The defendant next contends that the trial court erred when it denied trial counsel's motion to withdraw filed after the defendant filed an ARDC complaint alleging trial counsel had conspired with a relative of Avery to ensure the defendant's conviction. Alternatively, the defendant contends that the trial court erred because it did not appoint new counsel to represent the defendant during posttrial proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). We reject both contentions.

¶ 33     The defendant's first contention is based on his claim that filing an ARDC complaint against trial counsel created a *per se* conflict of interest that required appointment of new counsel. A defendant's sixth amendment right to the effective assistance of counsel includes the right to conflict-free representation. *People v. Peterson*, 2017 IL 120331, ¶ 102. Two categories of conflict exist: *per se* and actual. *Id.* A *per se* conflict of interest exists when facts about an attorney's status engender by themselves a disabling conflict. *Id.* ¶ 103. Our supreme court has recognized three situations that create a *per se* conflict of interest: " '(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved with the prosecution of defendant.' " *Id.* (quoting *People v. Fields*, 2012 IL 112438, ¶ 18).

¶ 34     Unless a defendant waives his right to conflict-free representation, the existence of a *per se* conflict of interest is a ground for automatic reversal. *Peterson*, 2017 IL 120331, ¶ 104. On the other hand, if a defendant cannot show *per se* conflict of interest, reversal of a conviction requires a showing of an actual conflict. *Id.* ¶ 105. To succeed on an actual conflict claim, the defendant must establish that the conflict adversely affected counsel's performance. *Id.* Where, as here, the

facts relevant to the conflict-of-interest issue are not in dispute, we review the issue *de novo*. *Id.* ¶ 101.

¶ 35    Here, we find that there was no *per se* conflict created by the filing of the ARDC complaint. The filing of an ARDC complaint does not fall into one of the three categories identified by the supreme court as *per se* conflicts of interest. Therefore, the defendant was required to show an actual conflict. However, the defendant has identified nothing in the record that supports his claim that trial counsel's performance was adversely affected by the alleged conflict. Moreover, it was the defendant, himself, who objected to trial counsel's motion to withdraw and requested that trial counsel handle posttrial matters. Accordingly, we conclude that the trial court did not err when it denied trial counsel's motion to withdraw.

¶ 36    The defendant cites to *People v. Cano*, 220 Ill. App. 3d 725 (1991) in support of his claim that the complaint created a *per se* conflict. We acknowledge that *Cano* does include language arguably supporting the defendant's position. See *Id.* at 732 ("[W]e find that a *per se* conflict existed at the sentencing hearing.") However, the language in *Cano* has been strongly criticized as overly broad. See *People v. Levesque*, 256 Ill. App. 3d 639, 649 ("[B]ecause we believe that the holding of *Cano* is worded too broadly, that case will not be followed by this court."); see also *People v. Steward*, 295 Ill. App. 3d 735, 748 (1998). Further, the wording in *Cano* is inconsistent with the clear language of our supreme court limiting *per se* conflicts of interest to the three categories identified above. See *Peterson*, 2017 IL 120331, ¶ 103. Moreover, we are not faced with a factual situation akin to *Cano* where the supervisor of the attorney alleged to be deficient requested that he not be placed in the position of arguing the incompetence of an attorney he supervised. Here, the defendant's trial attorney was not asked to argue his own incompetence.

Accordingly, we decline the defendant's invitation to follow the *Cano* court's interpretation of *per se* conflicts of interest.

¶ 37     The defendant also contends that the trial court erred when it failed to appoint new counsel after a hearing on the defendant's *pro se* claims of ineffective assistance of counsel, commonly referred to as a *Krankel* hearing. See *People v. Krankel*, 102 Ill. 2d 181 (1984). Posttrial claims of ineffective assistance of counsel are governed by the common-law procedure developed by the supreme court in *Krankel* and refined in subsequent cases. *People v. Roddis*, 2020 IL 124352, ¶ 34. New counsel is not automatically appointed in every case. *Id.* ¶ 35. Rather, when a defendant makes a claim of ineffective assistance of counsel, the trial court should first examine the factual basis for the defendant's claim. *Id.* The trial court need not appoint new counsel for claims that lack merit or pertain to trial strategy. *Id.* We review the issue of whether the trial court conducted a proper *Krankel* inquiry *de novo. Id.* ¶ 33.

¶ 38     Here, we cannot conclude that the trial court erred in its handling of the defendant's claim of ineffective assistance of counsel. The defendant argues trial counsel was ineffective for failing to call alibi witnesses and that the trial court erred when it found that this was a matter of trial strategy. We disagree. Decisions concerning which witnesses to call and what evidence to present on a defendant's behalf are matters of trial strategy that are generally immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432 (1999); see also *People v Custer*, 2019 IL 123339, ¶ 39. Here, trial counsel explained that he considered calling an alibi witness but elected not to after learning that the witness had given a State investigator a statement that defeated the alibi. In this case, where the defendant was identified by two witnesses who had known him for approximately 20 years and had a good opportunity to observe him during the

commission of the offense, it was not unreasonable for trial counsel to elect not to present a potentially impeached alibi defense. Therefore, we conclude the trial court did not err by failing to appoint new counsel to represent the defendant following the *Krankel* inquiry.

¶ 39 Finally, the defendant argues that his 40-year sentence is excessive and an abuse of discretion. There is a rebuttable presumption that a sentence within statutory limits is appropriate. *People v. Gooch*, 2014 IL App (5th) 120161, ¶ 8. The trial court is in a superior position to observe the defendant and the proceedings and weigh such factors as a defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Williams*, 2019 IL App (1st) 173131, ¶ 20. A reviewing court will not disturb a sentencing decision simply because it would have weighed these factors differently. *Id.*

¶ 40 Here, the defendant had an extensive criminal background, including 10 prior felonies. He was on supervised release from a federal firearms offense when he committed the instant offense. Although Avery was not seriously hurt during the kidnapping and vehicular hijacking, the offenders threatened serious harm, and the defendant was heard urging his accomplices to shoot or "pop" Avery. The crimes with which he was charged carried a potential sentence, including a firearm enhancement, of 21 to 45 years. See 720 ILCS 5/18-4(b) (aggravated vehicular hijacking); 720 ILCS 5/10-2(b) (aggravated kidnapping); 730 ILCS 5/5-4.5-25(a) (West 2012). The defendant was sentenced to five years below the maximum. Therefore, we cannot conclude that the trial court's sentence constituted an abuse of discretion.

¶ 41 For the reasons above we affirm the judgment of the circuit court of Cook County.

¶ 42 Affirmed.