NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 200173-U

Order filed September 4, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* R.V. and V.V., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors | ) | Peoria County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal Nos. 3-20-0173 and 3-20-0174 |
| | ) | Circuit Nos. 16-JA-170 and 18-JA-88 |
| v. | ) | |
| | ) | |
| Michael V., | ) | Honorable |
| | ) | Timothy J. Cusack, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Presiding Justice Lytton and Justice Wright concurred in the judgment.

_____

**ORDER**

¶ 1     Held:   The trial court's determination that it was in the best interest of the minors to terminate the respondent's parental rights was not against manifest weight of the evidence.

¶ 2     The respondent, Michael V., appeals from the circuit court's order terminating his

parental rights as to his minor children, R.V. and V.V. On appeal, respondent argues the trial

court's finding that it was in the best interest of the minors to terminate his parental rights was against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        R.V. was born in November 2015, and V.V. was born in February 2018. Respondent is the minors' biological father.

¶ 5        On July 23, 2016, and February 27, 2018, the State filed petitions for the adjudication of wardship of R.V. and V.V., respectively. The State alleged in the petitions that the minors were neglected in that their environment was injurious to their welfare and that the minors' mother and respondent had previously been found unfit with no subsequent finding of fitness.

¶ 6        Specific to the petition regarding R.V. (case no. 16-JA-170) filed on July 23, 2016, the State alleged that respondent had previously been found unfit in case no 13-JA-301 on July 2, 2014, had not completed all services that would result in a finding of fitness, was a registered sex offender (convicted in 2009 for "indirect solicitation/aggravated criminal sexual abuse"), had previously been a juvenile sex offender (as to three counts of aggravated criminal sexual assault), and had been assessed as being at high risk for reoffending. On November 3, 2016, the parties stipulated to the allegations of neglect regarding R.V. and agreed to an immediate dispositional hearing, during which the trial court found respondent unfit.

¶ 7        Specific to the petition regarding V.V. (case no. 18-JA-88) filed on February 27, 2018, the State asserted the same allegations as set forth in the petition related to R.V. and additionally alleged that: respondent had previously been found unfit in two cases (no 13-JA-301 on July 2, 2014, and no. 16-JA-170 (R.V.'s case) on November 3, 2016); following the birth of V.V., respondent and the minors' mother told hospital staff that the Department of Children and Family Services (DCFS) had not met with them and that they were allowed to be unsupervised

with V.V., which was not true; and respondent had mental health problems, which included adjustment disorders (including schizoid, avoidant, schizotypal, and paranoid features, persistent depressive disorder, and psychological trauma).

¶ 8    On April 18, 2018, the minors' mother surrendered her parental rights to the minors.

¶ 9    On May 2, 2018, respondent stipulated to the allegations in the neglect petition, and the circuit court found V.V. to be neglected. On May 30, 2018, the circuit court entered a dispositional order indicating it found respondent to be unfit.

¶ 10    On December 2, 2019, the State filed petitions to terminate respondent's parental rights as to R.V. and V.V.. In the termination petitions, the State alleged respondent was an unfit person pursuant to section 50/1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)) in that respondent failed to make reasonable progress toward the return home of the minor during any nine-month period following the adjudication of neglect, with the nine-month period being March 2, 2019, to December 2, 2019.   On March 11, 2020, the trial court found that the State had proven the allegations of unfitness set forth in the termination petition. By agreement of the parties, the best interest hearing took place immediately following the unfitness hearing.

¶ 11    At the best interest hearing, the circuit court asked if all parties received the best interest report for the minors, and they acknowledged having received reports for the minors. The best interest report indicated that at the time of the report, R.V. (age 4) had been in substitute care for 1027 days (since July 13, 2016) and had been living with his current foster family for 825 days (since November 28, 2017, after being transferred from another foster family). V.V. (age 2) had been in substitute care since February 2018 (shortly after her birth), at which time she was placed in her current foster home with R.V. (her biological brother). The foster parents' home was

3

observed by the caseworker as having adequate food, being in a good state of repair, and having adequate space for the family. There were no apparent safety issues with the home. The foster parents provided appropriate medical care for the minors. The minors' safety and welfare needs (including food, shelter, clothing, health, and education) were being met by their foster parents. Both R.V. and V.V. attended church with their foster parents. The minors' sense of security and familiarity was with their foster family. Both minors referred to their foster parents as "mom" and "dad" and referred to their older foster siblings as their family. When the minors were upset, they wanted to be with their foster parents. The foster parents were willing and able to adopt R.V. and V.V.

¶ 12     The best interest report further indicated that R.V. was enrolled in preschool and the foster parents provided him with all needed school supplies, met with the teacher on a regular basis, and attended school meetings and conferences. R.V. was doing well in school, and, according to R.V.'s teacher, the minors' foster mother was very involved with his schooling. R.V. attended speech therapy through his school program as well as speech and occupational therapy at Children's Hospital in Peoria. R.V.'s speech was improving.

¶ 13     The caseworker also indicated in the best interest report that the minors' relationship with respondent was minimal, with them having visits with him only one hour per month. The supervising worker reported that R.V. and V.V. did not acknowledge respondent much during visits and, instead, played together on their own. The caseworker noted in the best interest report that the minors had a strong relationship with their foster mother. The minors' foster mother loved the minors, and she viewed them as if they were her own children. The minors were very comfortable around their foster parents. The minors smiled, laughed, and interacted positively with both their foster mom and their foster dad. The minors had strong bonds with their older

4

foster siblings. R.V. made friends through preschool and church, and V.V. made friends through church. In the best interest report, the caseworker indicated that she believed it was in the best interest of the minors to terminate respondent's parental rights, noting their need for permanency.

¶ 14   Respondent testified that he felt that he had a bond with R.V., like any other parent would have with their child. Respondent further testified that R.V. knew him as "dad." Respondent described his relationship with R.V. as loving and close. Respondent testified that R.V. did not want their visits to end and at the conclusion of their visits, R.V. did not want to leave respondent's side. Respondent testified there was physical affection between him and R.V., such as hugging and playing. R.V. started to bring a mask and cape to visits for respondent to wear. During the visits, respondent would let R.V. choose the music to play or the movie to watch. Respondent described R.V. as excited and happy during their visits. Respondent testified that at the end of visits, R.V. stated, "[d]ad, go home" or "[h]ome dad," which respondent believed was an indication that R.V. wanted to go home with respondent. Respondent further testified that V.V. said "daddy" in reference to him and that his visits with V.V. go just the same as with R.V.

¶ 15   Respondent testified that he had food and clothes for the minors. Respondent doubted that the minors' current placement was suitable because he saw a picture of a dog with R.V. and the dog's expression appeared unsafe. He also believed the minors' current placement was unsuitable because he believed it was important for kids to celebrate holidays, such as Christmas, Halloween, and Easter. He was told by the minors' foster family that they did not celebrate Halloween, and he suspected that they did not celebrate any holidays. Respondent also believed that the minors' placement was not in the minors' best interest because he is their parent. Respondent testified the minors had never been in his daily care.

5

¶ 16    The minors' foster mother testified that she has been R.V.'s foster mother since November 2017, after he transferred from another foster family. She had been V.V.'s foster mother since February 2018 (shortly after V.V.'s birth). The minors' lived with their foster mother, foster father, and the foster parents' 20-year-old and two 15-year-old children. The minors' foster mother described R.V. as "a ray of sunshine" in their house and as a "wonderful kid." She indicated they were growing every day together and that he had come "a long way" since being placed with them. The minors' foster mother indicated that V.V. had known no other family. In the previous September, respondent's supervised visits with the minors had been reduced to once per month. The minors' foster mother indicated that R.V. became stressed and his behavior was not good prior to his visits with respondent, with R.V. becoming aggressive and "go[ing] after" V.V. The minors' foster mother described R.V.'s aggression as him having "far more squabbles" with V.V. that resulted "in the use of his hands" to hurt or pinch. She now only gave R.V. 30 minutes of notice prior to his visits with respondent. She could not send R.V. to school on the days after visits because R.V. had a history of getting into trouble the day following a visit with respondent. She described an instance where R.V. became physical with the other children in his class. The minors' foster mother described V.V. as becoming clingy and grouchy after visits. On cross-examination, she acknowledged that she had no way of knowing if the minors' behavior after visits was the result of them being upset that the visit had ended.

¶ 17    The minors' foster mother testified that she had facilitated and observed visits between the minors and respondent. She believed that R.V. thought of respondent as a "really good friend." She never heard R.V. refer to respondent as "dad" or "father." V.V.'s bond with respondent was also that of a good friend, and V.V. enjoyed going to visits to play with her "good friend." The minors' foster mother testified, "I'm not sure either of them understand that

6

he is their father. I think they're too young." The minors called their foster father "dad" and called her "mom."

¶ 18     The minors' foster mother testified that she and her family celebrated standard American holidays (such as Christmas, New Years, and Easter) with the minors, except for Halloween. They did not celebrate Halloween due to religious reasons. The minors' foster mother testified that she had three dogs in their home and neither of the minors showed any fear of the dogs.

¶ 19     The trial court found that the State proved that it was in the best interest of the minors to terminate respondent's parental rights. The trial court specifically found that the minors' physical safety and welfare needs, including their need for food, shelter, health, and clothing, and the development of their identity, their background ties, their sense of attachment, and their need for permanence favored continuing them in the care of their foster parents. The trial court terminated respondent's parental rights.

¶ 20     Respondent appealed.

¶ 21                        II. ANALYSIS

¶ 22     On appeal, respondent argues the trial court's finding that it was in the best interest of the minors to terminate his parental rights was against the manifest weight of the evidence. Respondent argues that he presented evidence of a strong bond with the minors and that "an outcome such as guardianship" should have been explored before taking the "drastic step of termination." The State contends the trial court did not err in finding that it was in the best interest of the minors to terminate respondent's parental rights.

¶ 23     In Illinois, the authority to involuntarily terminate a person's parental rights is statutorily derived from the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)) and the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). *In re K.P.*, 2020 IL App (3d)

7

190709, ¶ 35 (citing *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). The involuntary termination of parental rights is a two-step process. 705 ILCS 405/2-29(2) (West 2018); *K.P.*, 2020 IL App (3d) 190709, ¶ 35 (citing *In re C.W.*, 199 Ill. 2d 198, 210 (2002)). Initially, the court must find that a parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) by clear and convincing evidence. *K.P.*, 2020 IL App (3d) 190709, ¶¶ 35, 37. At the subsequent best interest stage, the State bears the burden of proving by a preponderance of the evidence that the termination of parental rights is in the child's best interests. *Id.* ¶¶ 35, 41. The preponderance standard is a less stringent standard than the standard of proof beyond a reasonable doubt and even less stringent than the intermediate standard of clear and convincing evidence. *Id.* ¶ 41 (citing *People v. Peterson*, 2017 IL 120331, ¶ 37). To meet the preponderance of the evidence standard, the State need only present enough evidence to render the fact at issue more likely than not. *Id.*

¶ 24    In determining whether terminating parental rights is in the best interest of a child, the trial court shall consider, within the context of the child's age and developmental needs, the following factors: (1) the physical safety and welfare of the child (which includes food, shelter, health, and clothing); (2) the development of the child's identity; (3) the child's background and ties (familial, cultural, and religious); (4) the child's attachments (which includes where the child feels love, attachment, and a sense of being valued, the child's sense of security and familiarity, continuity of affection for the child, and the least disruptive placement alternative for the child); (5) the child's wishes and long-term goals; (6) community ties of the child; (7) the child's need for permanence (which includes the need for stability and continuity of relationships with parent figures, siblings, and other figures); (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.

8

705 ILCS 405/1-3(4.05) (West 2018). A reviewing court will not reverse a trial court's best interest determination unless it is against the manifest weight of the evidence. *K.P.*, 2020 IL App (3d) 190709, ¶ 43. A best interest determination is against the manifest weight of the evidence where it is clearly apparent from the record the opposite conclusion should have been reached or that the conclusion itself is unreasonable, arbitrary, or not based on the evidence presented. *Id.*

¶ 25    In this case, the evidence presented indicated that the minors' foster parents were meeting the physical safety and welfare needs of the minors. The minors identified themselves as being a part of their foster family. The minors felt loved by and were attached to their foster parents. The minors had been in the continuous care of their foster parents for over two years and their foster parents were willing to adopt them. The minors, as biological siblings, were able to remain together in their current placement. The evidence was conflicting as to the strength of the bond the minors had with respondent (with respondent describing their bond with him much stronger than his bond with them was described by their foster mother or the caseworker). The respondent was required to have supervised visits with the minors and only had visits with them for one hour per month. The minors had never been in respondent's care. The evidence was clear as to the minors' need for permanency, with both minors having been in substitute care for over two years. In reviewing the statutory factors within the context of R.V. and V.V.'s ages and their developmental needs, we cannot say that the facts clearly demonstrate that the trial court should have reached the opposite conclusion or that its determination to terminate respondent's parental rights was unreasonable, arbitrary, or not based on the evidence presented. See *id.*

¶ 26    We, therefore, conclude that the trial court's finding that it was in R.V. and V.V.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 27                                    III. CONCLUSION

¶ 28        The judgment of the circuit court of Peoria County is affirmed.

¶ 29        Affirmed.