2025 IL App (4th) 241056-U

NOS. 4-24-1056, 4-24-1057 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
September 3, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JERIMIAH DAVID GIVENS, | ) | Nos. 21CF530 |
| Defendant-Appellant. | ) | 22CF325 |
| | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's conviction and revocation of his probation where defendant failed to establish trial counsel was ineffective.

¶ 2    In McLean County case No. 22-CF-325 (appeal No. 4-24-1057), defendant, Jerimiah David Givens, was found guilty but mentally ill of one count of resisting a peace officer, thereby causing injury to the officer (720 ILCS 5/31-1(a-7) (West 2022)), and one count of resisting a peace officer (720 ILCS 5/31-1(a) (West 2022)), and he was found guilty of one count of walking on a highway (625 ILCS 5/11-1007 (West 2022)).

¶ 3    In McLean County Case No. 21-CF-530 (appeal No. 4-24-1056), the trial court revoked defendant's probation for unlawful restraint (720 ILCS 5/10-3 (West 2020)) based on defendant's convictions in case No. 22-CF-325.

¶ 4        Defendant asserts the convictions in case No. 22-CF-325 and the revocation of his probation in case No. 21-CF-530 should be vacated because his counsel in case No. 22-CF-325 was ineffective. We affirm.

¶ 5                              I. BACKGROUND

¶ 6                              A. Unlawful Restraint

¶ 7        In August 2021, defendant pleaded guilty to unlawful restraint, and the trial court sentenced him to 30 months' probation. On April 24, 2022, the State petitioned to revoke defendant's probation based on the charges filed in case No. 22-CF-325.

¶ 8                              B. Resisting a Peace Officer

¶ 9        On April 5, 2022, defendant was charged with one count of walking on a highway. On April 6, 2022, he was charged with one felony count of resisting a peace officer, thereby causing injury to the officer (Steven Moreland), and three misdemeanor counts of resisting a peace officer (Moreland or Brandt Parsley). On April 13, 2022, he was charged with a superseding felony count of resisting a peace officer, thereby causing injury to Officer Moreland. All counts related to an incident on April 5, 2022, in which defendant was seen walking along an interstate highway and failed to cooperate with the officers who attempted to stop him and then arrested him. The State nol-prossed one misdemeanor count relating to Moreland.

¶ 10                              1. *The Unfitness Finding*

¶ 11        On June 16, 2022, the trial court granted the request of defendant's counsel to appoint an expert to determine whether there was a *bona fide* doubt as to defendant's fitness to stand trial. Dr. Terry M. Killian, a psychiatrist, reported to the court that he had attempted to examine defendant via a Zoom connection. Defendant would not talk to Killian. However, Killian was able to review "mental health records" and the "probable cause statement from 04/05/2022."

Kilian reported that defendant had "unspecified psychotic disorder with catatonia (probable schizoaffective disorder)" and was unfit to stand trial, but he could probably be restored to fitness within a year. Killian also reported, unprompted:

> "It is my opinion, within a reasonable degree of psychiatric certainty, that at time of the alleged offense on 04/05/2022, [defendant] was suffering from symptoms of his psychotic disorder to the extent that he would have been unable to appreciate the criminality of his alleged conduct. This is clear in the probable cause statement that day and from the [emergency room] note from just a few days earlier."

On August 9, 2022, the court reviewed Killian's report and found defendant was unfit to stand trial and transferred defendant to the custody of the Illinois Department of Human Services to undergo treatment.

¶ 12        On December 6, 2022, an evaluator reported that defendant was able to understand the judicial process and the charges against him and communicate with his attorney. The trial court determined defendant was fit to stand trial.

¶ 13                                    2. *The Bench Trial*

¶ 14        The trial court held a bench trial on January 2, 2024. Defendant raised the defense of insanity.

¶ 15                                    a. The State's Case

¶ 16        Officer Moreland of the Bloomington Police Department testified that he was dispatched to an interstate highway on-ramp because of a report of a person, whom he later identified as defendant, "walking in the roadway." Moreland, who was uniformed and arrived in a marked squad car, found defendant walking toward the highway on the right side of the ramp, which the State's video evidence showed went downhill to the highway. Defendant did not respond

to Moreland's attempts to speak to him but continued to walk away from Moreland and towards the highway. Defendant then crossed the entry ramp roadway and started walking away from the highway. Moreland "asked him if he was okay," and then, noticing defendant's hands were in his pockets, ordered defendant to "show *** his hands." Defendant did not comply, so Moreland informed defendant he would be tased if he did not take his hands out of his pockets.

¶ 17        While this was occurring, Sergeant Parsley of the Bloomington Police Department arrived to assist Moreland. Parsley recognized defendant—the State's video evidence showed that Parsley addressed him by name. When defendant still did not comply with either officer, they decided to arrest defendant. Each grabbed one of defendant's wrists, and they "did a leg sweep and took him down to the ground." When defendant fell, he pulled his hands beneath his body. They cuffed defendant's right hand but were unable to cuff his left hand because defendant "was flailing around, throwing his feet around." Moreland then tased defendant without deploying the Taser's darts. Because Moreland gave defendant too much space when tasing him, defendant freed himself from the two officers and started running downhill. Moreland pursued, attempted unsuccessfully to tase defendant again, and ordered him to stop. Defendant did not respond, and Moreland tased him a second time. This partially incapacitated defendant, but the officers still had "a little bit of a struggle" to handcuff defendant. Because of defendant's size, they used two pairs of handcuffs, "as to not torque his back real bad." When one end of the pair of handcuffs was on one of defendant's hands, he resisted by grabbing at the other open end of the set of handcuffs. Moreland hit defendant four times on his side to distract him, and the officers eventually secured defendant. Defendant was then taken to Carle BroMenn Medical Center (Carle) because a taser dart was stuck in the back of his head.

¶ 18        Moreland testified he received a cut to his hand while struggling with defendant.

- 4 -

¶ 19 Parsley testified that, in response to a request for assistance from Moreland, he activated his squad car's sirens and lights and drove it to the highway on-ramp. On arriving, Parsley saw Moreland following defendant on foot with his taser out. Defendant was not responding to Moreland's commands and did not respond to Parsley's command to remove his hands from his pockets. Moreland and Parsley "were unsure why [defendant] was just completely not even acknowledging our existence." Parsley explained, "I mean, I pulled up in a squad car right in front of him with my lights on and he walked right around us."

¶ 20 The trial court viewed video evidence from police dashboard and body cameras. The videos are essentially consistent with the testimony of the officers. The testimony did not entirely capture the extent to which defendant weaved off the shoulder and into the roadway as he walked.

¶ 21                                     b. Defendant's Case

¶ 22 The defense called Dr. Killian as an expert witness. Killian's *curriculum vitae* stated that he was a clinical associate professor of psychiatry at Southern Illinois University School of Medicine and had taught forensic psychiatry to psychiatric residents since 2013. After the State stipulated to Dr. Killian's qualifications, the trial court certified him as an expert in forensic psychology. The court also admitted the fitness report as a defense exhibit.

¶ 23 Dr. Killian testified that, on June 16, 2022—72 days after defendant's arrest— Jackie Mathias, the McLean County jail's medical coordinator, called him and asked him to examine defendant as soon as he could. Killian agreed to examine defendant via a Zoom connection; he was uncertain whether, when he agreed to the examination, he had known that the trial court had appointed him to evaluate defendant's fitness.

¶ 24 Dr. Killian spent 15 minutes attempting to interview defendant. The examination

was very short because defendant was entirely unresponsive to anything Killian said and made no "verbal statements." Killian read the police report of defendant's arrest and reviewed defendant's medical records either before the Zoom call or soon afterwards. These were consistent with his observations of defendant.

¶ 25 Dr. Killian testified that, according to defendant's medical records, defendant was seen in an emergency room on April 1, 2022—four days before his arrest—as the result of a police petition for his involuntary hospitalization. Officers had found him "wandering around in traffic." The records described him as "being catatonic, pretty much unresponsive to questions." This was consistent with what Killian observed of defendant's state on June 16. Killian was not aware of the outcome of defendant's emergency room visit.

¶ 26 Dr. Killian explained that defendant's symptoms were consistent with schizoaffective disorder, which is characterized by the presence of "schizophrenic-like symptoms" and symptoms of bipolar mood disorder. He could determine that defendant did not have bipolar mood disorder because, unlike a person with bipolar mood disorder, defendant's schizophrenic-like symptoms persisted when he was not manic.

¶ 27 Defendant also had been diagnosed with the medical condition rhabdomyolysis, the abnormal presence in the blood of proteins from the breakdown of muscle tissue. Dr. Killian said that the psychiatric significance of rhabdomyolysis was that, given defendant's other symptoms, it suggested the presence of a form of catatonia. He explained that catatonia has two forms: the better-known form, in which "people are frozen," and a form in which "people *** are almost wild" to the extent that they can incur muscle damage consistent with rhabdomyolysis.

¶ 28 Dr. Killian formed the opinion that mental disease had caused defendant to lack the capacity to appreciate the criminality of his conduct. He testified he always considers the

possibility of malingering when conducting his examinations. However, he did not comment on the possibility of malingering in his fitness report because "[i]t was so obvious that [defendant] was extremely mentally ill at that time."

¶ 29 On cross-examination, Dr. Killian agreed he had not reviewed the videos from defendant's arrest. Asked whether such videos could be diagnostically useful, he responded:

"Not in this case. Often, often, the police body camera videos are very helpful. In this case it was not necessary because the other information I had was so clear. It wouldn't have hurt anything to have it, but it is time-consuming, would cost the county more. So, I would not have asked for it in this case because the evidence in my mind was so clear about the events at the time. The time frame of those events."

The following exchange ensued:

"[THE STATE]: But you will admit that your evaluation and your interrogation with [defendant] was 72 days after his arrest?

[KILLIAN]: Correct. But I had documentation from the time of the crime.

Q. But *** isn't video evidence more persuasive to you than a police report or a probable cause statement that is filtered through a non-psychiatrist's eyes, it is a police officer?

A. Yes.

Q. Wouldn't the video be more valuable to you?

A. If the only other document I had was the probable cause statement, yes.

Q. Did you review medical records from Carle from the day of his arrest on April 5th of 2022?

A. No.

Q. To your knowledge was he even transported to the hospital on the day of his arrest?

A. I don't know. I don't know if he was."

¶ 30       Dr. Killian agreed that his attempt to interview defendant in jail was hampered by "some difficulties with [the] Zoom interaction." The attempted conversation was via an iPad, which Mathias pointed towards defendant through the bars of the cell. Defendant was not near the iPad's camera, and Killian could not see defendant's face well. Mathias had to repeat Killian's questions to ensure defendant heard them. However, Killian could determine defendant was "pretty much completely unresponsive." Defendant's nonresponsiveness precluded a direct evaluation of defendant's thought process or intellectual functioning.

¶ 31       The State asked Dr. Killian whether "people with mental health issues can deteriorate quickly." Killian responded:

> "Depending on what you mean by quickly. Quickly meaning within someone with schizoaffective disorder might deteriorate from being rational to being in the condition that [defendant] was [in] at the time of his [emergency room] admission on April 1st, his arrest on April 5th. It would probably take if he were to go from being reasonably rational to where he was, at least a month."

The State asked how defendant could have been in a condition to be released before his April 5 arrest if he were catatonic on April 1. Killian stated the hospital had likely erred in releasing defendant, but he did not know enough to understand why the release occurred.

¶ 32       On redirect examination, Dr. Killian explained, despite the difficulties with the jail interview, he was able to evaluate defendant's "body position or language." He could also see

defendant's cell "was extremely messy with food trays and other trash all over," which was something that he often observed in the cells of those in the "booking section" who are "severely mentally ill."

¶ 33 Defendant elected to testify. He said that he remembered walking on the highway on April 5, 2022, but he did not remember any details. He felt "like [he] was in a two-dimensional world." It was "weird to explain"; "[i]t felt like [he] wasn't in touch with reality." He "couldn't stop walking," but he did not know why. He chose the highway the police found him on because he knew he was walking to Joliet, Illinois. The first thing he could remember about his interaction with the police was someone grabbing his hand.

¶ 34 Defendant knew he had been in and out of the hospital. He was staying with his sister, and she would sometimes call the paramedics when he was "having an episode." The defense rested after defendant testified.

¶ 35 c. The Trial Court's Ruling

¶ 36 The trial court ruled that the State had met its burden of showing that defendant had resisted Officers Moreland and Parsley. It then found that defendant failed to show he was insane by clear and convincing evidence. The court focused on Killian's limited interactions with defendant:

"This is an interesting case because the doctor spent 15 minutes on a Zoom call with the defendant with Jackie Mathias holding *** an iPad outside the cell that the defendant was in. And the defendant never responded. And so the interview was cut short and really was not an interview. *** But the doctor *** never physically met with the defendant. ***

In addition to that interview, the doctor reviewed 10 to 15 pages of

- 9 -

documents in relation to the defendant. And that is the extent of the review that took place.

* * *

I guess the Court has some—discomfort with [Killian's insanity] finding based on the information that the doctor had. The doctor requested additional information, and that information led to that same conclusion. But, of course, that is pure speculation. The doctor seemed *** to take a leap of faith, in essence, from this defendant is unfit to stand trial, to he didn't understand the criminality of his conduct. The doctor did not ask for more information. He did not review the video footage. And I don't know what other information might be out there to assist the doctor, but when you review the video footage, while the defendant was not going to or did not communicate with the officers, he simply walked and continued to walk away and turn and walked back up the on-ramp. He did not obey the officer's [commands].

Through his testimony today he indicated he recalls at least portions of the incident, that the officers, that somebody grabbed his hand. During the video he is seen getting up and running from the officers, which would indicate an attempt to flee."

¶ 37 The trial court found defendant guilty but mentally ill on all counts except the one charging "pedestrian on a roadway," of which it found him simply guilty because mental state was not an element of the offense. The court ruled that the two misdemeanor counts on which defendant was tried merged into the felony count but that the petty offense of walking on the highway did not merge. The court also ruled the petition to revoke defendant's probation in case No. 21-CF-

530 was proven based on defendant's convictions.

¶ 38   Defendant filed a posttrial motion arguing that, among other things, the trial court erred in finding he failed to provide sufficient evidence he was insane. The court stood by its reasoning and denied the motion.

¶ 39   The trial court imposed a sentence of three years' imprisonment for resisting a peace officer and resentenced defendant in case No. 21-CF-530 to three years' imprisonment, with those sentences to be served concurrently. Defendant moved for reconsideration of both sentences, and the court denied the motion.

¶ 40   This consolidated appeal followed.

¶ 41                    II. ANALYSIS

¶ 42   On appeal, defendant argues that defense counsel was ineffective for failing to have Dr. Killian review the proper evidence. He states, "Killian *** was never asked to review any of the evidence of [his] behavior at the time of the of the offense, including the squad and bodycam footage." He contends counsel's failure to ask Killian to review such evidence was unreasonable because it lacked any possible strategic benefit and so did not fall within the presumption of sound trial strategy.

¶ 43   Defendant further argues he suffered prejudice from counsel's unreasonable behavior "because the deficiency concerned the sole issue at trial," his sanity. Defendant requests we vacate his convictions and the revocation of his probation and grant him a new trial in case No. 22-CF-325.

¶ 44   In response, the State contends that defendant established neither the unreasonableness of counsel's conduct nor prejudice from any unreasonable conduct. Concerning prejudice, the State argues that, had Dr. Killian reviewed evidence at issue, the outcome would

have been unchanged.

¶ 45    Defendant replies, *inter alia*, "Dr. Killian, however, could have interpreted [defendant's] behavior and told the [trial] court whether or not the observed behaviors were consistent with the psychological diagnosis and insanity."

¶ 46                    A. The Ineffective Assistance Standard

¶ 47    We follow the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), when we address a claim of ineffective assistance of trial counsel. See *People v. Veach*, 2017 IL 120649, ¶ 29 (noting Illinois's adoption of the *Strickland* standard). Under *Strickland*, a defendant must show both (1) counsel acted unreasonably and (2) counsel's unreasonable actions prejudiced the defense. *Strickland*, 466 U.S. at 687. In other words, a "failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 48    First, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight *** and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

¶ 49    Second, to show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 50    "Whether a defendant received ineffective assistance of counsel is a question of law that we review *de novo*." *People v. Haynes*, 2024 IL 129795, ¶ 23. In any event, defendant, as the

appellant, always has the burden to affirmatively show error. See, *e.g.*, *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 48.

¶ 51                                      B. This Case

¶ 52          Defendant argues counsel was ineffective for failing to have Dr. Killian review the arrest videos. Defendant contends, regardless of how certain Killian was of his opinion defendant was insane, counsel had the obligation to guide Killian to offer testimony sufficient to satisfy defendant's burden of showing insanity by clear and convincing evidence. See 720 ILCS 5/6-2(e) (West 2022) (stating a defendant must establish the affirmative defense of insanity by clear and convincing evidence). He asserts he was prejudiced by counsel's conduct where "[c]ounsel's failure to properly prepare Killian led the [trial] court to conclude that the expert opinion was 'speculation' and ultimately find that the defense was not proven by clear and convincing evidence." He claims, "if Killian [were] able to review the evidence, his opinion that [defendant] lacked the substantial capacity to appreciate the criminality of his conduct at the time of the offense would have been supported."

¶ 53          Defendant has failed to show he was prejudiced by counsel's allegedly unreasonable omissions. We can do no more than speculate about what Dr. Killian would have said if he had watched the video evidence. Defendant is correct in his reply brief when he states, "Killian *** could have interpreted [defendant's] behavior [as displayed in the video recordings] and told the [trial] court *whether or not* the observed behaviors were consistent with the psychological diagnosis and insanity." (Emphasis added.) Because we do not know the psychiatric significance of the behaviors defendant displayed in the video evidence, we do not know whether such testimony would have helped defendant's case, hurt it, or made no difference.

¶ 54          To be sure, Dr. Killian appeared to believe reviewing the video evidence would

have made no difference. He testified video evidence from the time of the offense was often useful, but "[i]n this case it was not necessary because the other information [he] had was so clear." The nonrecord documents on which he based his opinion included a "probable cause statement" from the date of the incident and "police reports." Thus, Killian did have some information about defendant's behavior contemporaneous with his arrest. But, because these documents were not part of the record, we have no way to compare the level of detail in the documents to that in the video evidence. More critically, we do not know what an expert would look for in the video evidence, and we thus cannot determine the degree to which Killian's evaluation of the video evidence would make his testimony more or less favorable to defendant.

¶ 55 Based on the uncertainty of how reviewing the video evidence might have changed Killian's testimony, we conclude defendant did not show there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. He thus failed to show he was prejudiced by any unreasonable conduct of counsel (*Strickland*, 466 U.S. at 694), and he has therefore failed to make the showing necessary to support a claim of ineffective assistance of counsel (*Peterson*, 2017 IL 120331, ¶ 79).

¶ 56                                       III. CONCLUSION

¶ 57 For the reasons stated, we affirm the trial court's revocation of defendant's probation in appeal No. 4-24-1056 and defendant's conviction in appeal No. 4-24-1057.

¶ 58 Affirmed.